# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### September 2004 Session

## STATE OF TENNESSEE v. STEPHEN L. DENTON
**Appeal by permission from the Court of Criminal Appeals,**
**Criminal Court of McMinn County**
**Nos. 98-535 to 98-539, 98-694 to 98-705, 99-244, 99-246   R. Steven Bebb, Judge**

---

### No. E2000-02615-SC-R11-CD - Filed November 15, 2004

---

The defendant, a physician, was charged in three separate indictments with a total of twenty sexual offenses involving eleven different victims. The counts charged in the indictments were alleged to have occurred over a time span of six years. The trial court denied the defendant's pre-trial motion to sever the counts for separate trials and granted the State's motion to consolidate all three indictments for a single trial. The defendant was subsequently found guilty of one count of sexual battery by an authority figure, six counts of sexual battery, and three counts of assault. He was acquitted on three counts of rape and three counts of sexual battery. The defendant then presented several issues on appeal, including: (1) that the trial court erred in denying the motion to sever the offenses; and (2) that the defendant was improperly convicted of sexual battery by an authority figure. The Court of Criminal Appeals held, among other things, that the trial court erred in denying the motion to sever. However, the Court found this error to be harmless and therefore affirmed the convictions. The Court of Criminal Appeals also held that the defendant's conviction for sexual battery by an authority figure was proper as a physician fell within the ambit of the applicable statute. For the reasons stated herein, we hold that the failure to sever the counts against the defendant was reversible error, and therefore we reverse the convictions. Further, we hold that a physician is not an authority figure as contemplated under Tennessee Code Annotated section 39-13-527 (2003) and therefore the defendant's conviction under this statute was improper. Accordingly, the judgment of the Court of Criminal Appeals is reversed, and the case remanded for new trials.

### Tenn. R. App. P. 11 Application for Permission to Appeal;
### Judgment of the Court of Criminal Appeals Affirmed in Part, Reversed in Part, and Remanded.

WILLIAM M. BARKER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., E. RILEY ANDERSON and JANICE M. HOLDER, JJ., and J.S. (Steve) Daniel, SJ., joined.

D. Mitchell Bryant, Cleveland, Tennessee, and Victoria B. Eiger, New York, New York, for the appellant, Stephen L. Denton.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Assistant Attorney General; Jerry N. Estes, District Attorney General; and William W. Reedy and Amy Reedy, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### FACTS

The defendant, Dr. Stephen Denton, was a physician practicing in Athens, Tennessee. In 1998 a patient complained to authorities that the defendant had acted improperly during a physical examination, including inappropriately touching the patient's breast and genital area. Local police, joined by the Tennessee Bureau of Investigation (TBI), launched an investigation. An undercover TBI agent, Patrice Schermerhorn, posed as a friend of the complaining patient, Amanda Pritchett, and the two women returned to the defendant's office on July 30, 1998. Pritchett carried a video camera concealed in her purse for the purpose of recording the defendant's conduct during the visit. While Agent Schermerhorn waited outside, Pritchett and the defendant went into an examination room. Pritchett complained of a rash, and the defendant proceeded to perform an examination, during which he touched Pritchett's breasts, rubbed against her leg, massaged her shoulders, and discussed the possibility of himself and Pritchett having a romantic encounter.

Following this incident, Agent Schermerhorn, posing as "Teresa Price," made an appointment with the defendant, ostensibly seeking medical treatment. During this visit on August 17, 1998, Schermerhorn carried a video camera concealed in her purse along with an audio transmitter. Schermerhorn complained of sinus problems, and the defendant examined her throat, ears, nose, and the glands in her throat. Agent Schermerhorn proceeded to ask the defendant if he would be interested in a romantic liaison involving herself, Pritchett, and the defendant. He expressed interest and began to massage Schermerhorn's neck and back. The defendant asked if they could all meet in a hotel room for several hours. When the defendant attempted to kiss her, she pushed him away. The defendant then pressed his body against Schermerhorn, kissed her on the neck, and began to ask her questions of a sexual nature. He told Schermerhorn that he liked kinky sex, "the kinkier the better." Meanwhile, the defendant rubbed his hand on Schermerhorn's thigh until she pushed his hand away. The defendant then wrote Schermerhorn a prescription and she left, returning to the Athens Police Department to report the incident to other officers involved in the investigation.

The next day, based upon these incidents, the case was presented to the Grand Jury and an indictment returned against the defendant charging him with one count of rape, one count of sexual battery by an authority figure, and one count of sexual battery.[1] The defendant was arrested later that day at his office by Detective Bill Matthews of the Athens Police Department and Agent T.J. Jordan

---

[1] This indictment also charged two counts of illegally prescribing Schedule IV drugs in violation of Tennessee Code Annotated sections 53-11-308 and 53-11-401. These counts were later dismissed and are not included within our discussion.

of the TBI. Following the arrest, the defendant's office was searched, and the defendant was questioned by the arresting officers.

When news spread of the arrest, other women began to come forward with complaints against the defendant. These new complaints were investigated and a second indictment was subsequently returned against the defendant on November 17, 1998, charging him with three counts of rape, eight counts of sexual battery and one count of attempted rape. The offenses alleged in this indictment involved five other patients of the defendant: Jamie Hunt, Melissa Martin, Kathy Ritner, Dessie Ellis, and Brenda Mullinax.

Still more women continued to come forward with complaints, and a third indictment was returned against the defendant on March 16, 1999. This indictment charged the defendant with four counts of sexual battery and one count of rape involving four more female patients: Carolyn Grant, Sharon Roberts, April Martin, and Sandra Harley. In all, the defendant was charged with twenty sex-related offenses involving eleven different victims. The victims were all patients of the defendant and ranged in age from seventeen to forty-six years of age. The time period during which these crimes were alleged to have been committed covered six years. The earliest incident involved Sandra Harley and occurred in November of 1992. The other incidents occurred between April 1996 and August 1998.

Prior to trial, the State moved the trial court, pursuant to Rules 8 and 13 of the Tennessee Rules of Criminal Procedure, to consolidate all counts contained within the three indictments for a single trial. The defendant objected and subsequently filed a motion, pursuant to Rule 14 of the Tennessee Rules of Criminal Procedure, to sever all counts as to each victim. However, prior to trial the defendant agreed that the charges involving Pritchett and Schermerhorn could be tried together. As to the other counts, the defendant requested a separate jury trial be held for each alleged victim, in which all charges related to that victim would be tried.

At a pre-trial hearing on this issue, the State pointed out the factual similarities among the charges and argued that consolidation was proper as each crime "constitutes a fingerprint" of the defendant and the similarities exhibited the defendant's "crowning modus operandi." The court also reviewed videotapes showing each victim's statement to police and the recorded visits to the defendant's office by Pritchett and Schermerhorn. The trial court agreed with the State's argument for consolidation, stating there was a "pattern involved" to the acts and that, considered all together, they "told a story." Thus, the motion to sever was denied, and the indictments were consolidated for a single trial.

The case proceeded to trial in April, 2000, during the course of which several of the victims, along with investigating law enforcement officers and other witnesses, offered testimony. The first witness for the State was Sandra Harley, who testified concerning the events of a visit to the defendant's office in November of 1992. Harley stated that, at that time, she was eighteen years old and had delivered a baby earlier in the year. She went to the defendant due to "some sort of female problem." The defendant had been her doctor since she was fourteen years old, and she had seen

him as a patient on numerous occasions. On this visit, after hearing her complaints, the defendant asked her to undress from the waist down, with him leaving the room while she did so. Harley testified that she lay down on the examination table with her feet in stirrups and a sheet covering her. When the defendant reentered the room, he pushed on her abdomen, then inserted first one, then another, finger into her vagina and then removed them. The defendant then began to massage her clitoris and asked her if it hurt. At this point, Harley stated she stopped the examination and stepped off the table. She quickly put on her shorts, grabbed her purse in one hand and her shoes in the other, and immediately left the office. Harley went directly to her father's house and told him what had happened. Subsequently, the police were called, and Harley spoke to an officer, who made a report. Harley then went to the emergency room at a local hospital where a rape examination was performed. Harley testified that she never heard anything else about the case and never took any other action until 1998, when she learned the defendant had been arrested. At that time, she gave a statement to Detective Matthews and Agent Jordan concerning the 1992 incident.

James Landers, Sandra Harley's father, testified that Harley had arrived at his house, crying and shaking, following her appointment with the defendant in 1992. Within a few minutes of hearing Harley's description of the incident, Landers went to see the defendant and asked him what he had done to his daughter. The defendant stated all he had done was "mash on her stomach" and write her a prescription.

Melissa Martin, the second victim to testify, stated she first saw the defendant in 1997 seeking treatment for lower back pain she was experiencing following an automobile accident. During this visit, the defendant told Martin she was pretty and had a pretty smile and pretty hair. Martin testified that the defendant "mashed around" on her back and laid his head on her shoulder while he listened with a stethoscope. Martin thought it unusual for the defendant to place his head on her shoulder like this. On her second visit to the defendant's office, Martin said that the defendant sat in a chair and she could see that the defendant had "like, an erection on him." The defendant rolled the chair up close to Martin, and she could feel the defendant's erect penis touching her leg.

Martin further testified that, during an appointment in May of 1998, the defendant again had a noticeable erection and rubbed it against her leg. The defendant also asked her to stand up and unbutton her pants and, as she did so, he went over to the door and locked it. The defendant stood behind Martin and ran his hands up her shirt, massaging and rubbing her back, and asked her if she had anyone at home to do that. The defendant then ran his hands down her pants, massaged her buttocks, and placed his hand between her legs. Martin testified the defendant then "stuck his finger in my bottom," at which point she pulled up her pants and told him "it's not hurting there." The exam ended abruptly, and Martin left, immediately going to see her mother. Martin testified she told her mother, Doris Delzell, about the incident and also consulted her attorney the next day. However, Martin stated she did not pursue the matter because she was afraid no one would believe her. It was not until the defendant was arrested in 1998 that Martin came forward and reported her allegations to police.

Doris Delzell testified that, after Martin related the events of her visit to the defendant's office, Delzell wanted to confront the defendant. However, she decided not to do so when Martin agreed to speak to her attorney, Randy Rogers, about the incident.

Rogers testified that he was already representing Martin in a civil case arising out of the automobile accident in which Martin had injured her back. Rogers stated that Martin told him that she did not want to continue seeing the defendant as her doctor. When Rogers urged her to reconsider, Martin became distraught and told him what had occurred at her last visit with the defendant. Rogers then suggested "some remedies" such as filing a civil suit and reporting the incident to police.

Carolyn Grant testified that she was living in McMinn County in 1996 and 1997 and was assigned the defendant as her physician through TennCare. Grant testified that she saw the defendant every other week during this period due to pain in her back and abdomen. She said she felt uncomfortable with some of the defendant's actions and comments during these visits. Grant stated the defendant would hold and squeeze her breasts while he listened to her heart. The defendant would also roll his chair between her legs and "rub his genitalia on [her] knees" while he had an erection. Grant testified that this happened on every visit. During her last visit, Grant testified that the defendant hugged her and kissed her on the neck "in a way no doctor should ever be kissing you on the neck." The defendant also gave his pager number to Grant, telling her that if she needed to talk to someone they could get together for drinks. Grant testified that, following this last visit, she contacted law enforcement authorities but nothing came of her report. It was not until 1998, when Grant heard that the defendant had been arrested, that she again came forward and gave a statement to the investigating officers.

Sharon Roberts testified that she began seeing the defendant as her physician because she was experiencing back pain and the defendant was the only TennCare approved doctor in the area taking new patients. Roberts testified that the defendant ran his hands inside the back of her pants while examining her back. Roberts told the defendant to move his hand and "that's not where my back hurt[s]." The defendant complied with her request at that time. However, Roberts testified that he continually did other things that made her feel uncomfortable. She testified that the defendant would always place his hand on her breast while listening to her heart with a stethoscope and would tell her she looked pretty and smelled good. Roberts also noticed that the defendant would not do anything inappropriate if Roberts' daughter accompanied her into the examination room. Roberts continued to see the defendant professionally until he was arrested.

Brenda Mullinax testified that she is forty-six years old with three children and two grandchildren. Mullinax sought treatment from the defendant on only one occasion, January 29, 1997, to get her cholesterol checked. During this visit, Mullinax testified that the defendant sat on a chair, rolled it up between her legs, and attempted to put his "privates" on her legs. The defendant also continuously rubbed his hands on Mullinax's legs during this examination. Later, Mullinax complained to a nurse about the defendant's actions. The nurse told her to speak to another woman who worked in the office if she wanted to lodge a complaint. Mullinax testified that she spoke to

this woman two days later and complained about the incident. However, she did not report it to the police at that time as she was afraid no one would believe her. It was not until she saw that the defendant had been arrested that Mullinax came forward to authorities.

Kathy Ritner testified that she had previously been sexually assaulted while serving in the Navy. This incident had traumatized her and caused her to leave the Navy on medical retirement. Following her military service, she moved to Tennessee where she first saw the defendant in November of 1997. Ritner testified that she had been prescribed several types of anti-depressants and nerve medication while in the Navy and had come to the defendant to continue the treatment and medication. Ritner testified that during her visits, the defendant would place his hand on her breasts. During one visit in which she complained of back pain, Ritner testified the defendant ran his hands down her back and "kept going until he was into my private area." The defendant would also rub against her leg, and on some visits Ritner could tell that he was sexually aroused. Later, Ritner told the defendant that she wished to stop seeing him and was going to find another doctor. At that point, according to Ritner, the defendant became agitated, and Ritner became scared to be locked in a room with him. On her last visit, Ritner testified that the defendant placed his hands on her breast, in her rectum, and near her vagina; all of which, according to Ritner, was unnecessary. Ritner told her husband about these incidents but did not inform police until after the defendant was arrested on the other charges.

Jamie Hunt sought treatment from the defendant in August 1997 complaining of chest pain following an automobile accident. Hunt testified that, after informing the defendant of her chest pain, the defendant used a stethoscope to listen to her chest. However, the defendant told Hunt he could not hear her heart and asked her to remove her shirt and bra. Hunt testified that, after she removed her clothing, the defendant put down the stethoscope and held her breasts, lifted them, and rubbed them in what Hunt described as "a sexual rub." The defendant began to prepare Hunt for an EKG but continued to rub Hunt's breasts and thighs all the while, and the defendant also inserted a finger inside Hunt's vagina. Hunt testified that after this visit she told her mother-in-law what had occurred and also later told her attorney. Hunt also contacted the medical board regarding the defendant but took no further action until she learned about the other charges against the defendant.

Amanda Pritchett testified that she was seventeen years old and recently married when she sought treatment from the defendant in July 1998. Pritchett told the defendant that she had ringworm just below her belly button. Pritchett testified the defendant began the exam by listening to her chest with a stethoscope and that he placed his hand on her breast while doing so. The defendant complimented Pritchett on how pretty she was, telling her she could be a "Playboy model." Pritchett testified that the defendant leaned over very close to her and reached around to listen to her back, and as he did so, Pritchett could feel the defendant's erect penis pressing against her leg. The defendant then told Pritchett to pull her pants down so he could see the ringworm. Pritchett replied that he could see it without pulling down her pants because it was right below her belly button; however Pritchett did undo the first button of her pants. Pritchett testified that the defendant then pulled her pants down further, ran his hands down inside her pants, and put his fingers inside her vagina lips. Pritchett told the defendant that "there was no ringworm down there," and the defendant

brusquely told her to pull up her pants. The defendant then wrote Pritchett a prescription and she left. Pritchett testified that she had been on the verge of crying during the exam and had never been so scared.

Pritchett immediately went and informed her mother of what had happened. Three days later, Pritchett reported the incident to Detective Matthews of the Athens Police Department. It was this complaint that led to the investigation of the defendant. With the assistance of the TBI, a plan was developed whereby Pritchett and Agent Schermerhorn, using the fictitious name of "Teresa Price," would return to the defendant's office with a concealed video camera to record the visit.

This investigatory visit was accomplished on July 30, 1998, with Pritchett complaining to the defendant of a rash on her neck. Pritchett testified that on this occasion the defendant again placed his hand on her breast while listening to her chest. Pritchett testified she had been instructed by investigators as to the type of conversation to carry on with the defendant, so she began to ask the defendant questions regarding her previous visit. Pritchett recalled asking the defendant if he really thought Pritchett could be a Playboy model. The defendant replied, "Yeah, you have great features" and began to massage Pritchett's shoulders. Later in the visit, Pritchett and the defendant discussed the possibility of themselves secretly meeting somewhere for a romantic encounter. The videotape of this visit was viewed by the jury.

Agent Patrice Schermerhorn of the TBI testified that she posed as a friend of Pritchett's and went to the defendant as part of the investigation. Schermerhorn made an appointment with the defendant for August 17, 1998, ostensibly seeking treatment for sinus pain. Schermerhorn carried a concealed video recorder with her during this visit. Schermerhorn testified that during the course of the exam she commented to the defendant, "I hear you might want to go out with Mandy and I [*sic*] one time," referring to Amanda Pritchett as "Mandy." The defendant responded affirmatively and they discussed the details of such a meeting. Meanwhile, the defendant had begun to massage Schermerhorn's neck and shoulders. Schermerhorn testified that the defendant then tried to hug and kiss her, but she pushed him away. Schermerhorn also testified that the defendant placed his groin against her knee and "started moving back and forth." Schermerhorn stated that the defendant had an erection as he did this.

Later during this visit, the defendant asked Schermerhorn if she liked sex toys. Schermerhorn testified that the defendant told her he liked "sex, kinky sex, the kinkier the better." Schermerhorn also stated that the defendant told her he had his favorite sex toy with him, at which point the defendant "opened up his mouth, stuck out his tongue, and flicked it at me." The defendant also reportedly told Schermerhorn that the next time she visited the office with Pritchett they could all go into a room together. The jury then reviewed the videotape of this visit.

Detective Bill Matthews of the Athens Police Department testified that Amanda Pritchett and her husband came to the police department in July of 1998 to report the events of Pritchett's first visit with the defendant. Upon hearing Pritchett's allegations, Detective Matthews contacted the TBI for assistance and was put in touch with TBI Agent T.J. Jordan, who helped plan the undercover

visits to the defendant's office later conducted by Pritchett and Schermerhorn. Following these visits, Detective Matthews testified that he presented the case to a grand jury and the first indictment charging the defendant was returned.

Detective Matthews testified that as soon as the indictment was issued, he, along with Agent Jordan, went to the defendant's office and arrested him. Detective Matthews testified that, after the arrest, they advised the defendant of his Miranda rights and questioned him. It was during this interview, Detective Matthews testified, that the defendant admitted to having inappropriately touched female patients before and that he had "hunched on female patients' legs." The defendant stated, however, that he did not have a problem, he just got carried away sometimes. Detective Matthews also reported that the defendant admitted to having had consensual sex with female patients in his office and to having erections while touching female patients' breasts and genitalia.

Agent T.J. Jordan of the TBI also testified concerning the interview with the defendant following his arrest. Agent Jordan testified that the defendant admitted to having sexual contact with female patients and that some of the contact was "non-consensual or unwanted or unsolicited or something along those lines." Similar to the testimony of Detective Matthews, Agent Jordan also testified that the defendant admitted during questioning to "hunching" on female patients and to having an erection while doing so.

The first witness to testify for the defense was Dr. Michael Hood, a practicing physician from Newport, Tennessee. Dr. Hood testified as to the standard of care required of male doctors conducting examinations of female patients. Dr. Hood testified that the presence of a nurse is "pretty much accepted as being necessary during a pelvic exam." However, Dr. Hood also testified that such was not the case with breast exams, stating that he does not have a nurse present during breast exams about eighty percent of the time. Dr. Hood testified that he often sits on a rolling stool when examining patients and that occasionally his "private area" would come in contact with a patient's leg. Also, Dr. Hood testified that it was sometimes necessary to manipulate a female patient's breast when using a stethoscope. Dr. Hood further explained that during an examination of a patient's back or spine it was often necessary to press on or "palpate" the patient's lower back, including the area near the coccyx which is very near the rectum. Dr. Hood testified that it was often essential to do a rectal examination, including digitally penetrating the rectum, of a person complaining of a back injury.

Dr. Hood also reviewed medical files of some of the victims and testified that, in his opinion, it would have been proper for a doctor to palpate the lower back of both Melissa Martin and Kathy Ritner during an examination. Dr. Hood also testified that he had reviewed the EKG performed on Jamie Hunt and opined that it was not consistent with what would be expected from a person being sexually assaulted at the time. However, on cross-examination, Dr. Hood did admit that several of the acts alleged by the victims were not part of normal medical protocol and would not usually be done based upon the types of physical complaints the patients had presented to the defendant.

The defendant, Dr. Stephen Denton, testified that he was originally from Loudon County, Tennessee; had graduated from medical school in 1971; and had thereafter been on active duty in the United States Air Force until 1981. The defendant moved to Athens, Tennessee in 1981 and first worked at Athens Regional Hospital and later began his own private practice in 1987. The defendant testified that by 1998 he had over five thousand active patient files and was seeing up to sixty patients a day. The defendant denied ever touching any of the victims for sexual gratification and stated that he never intentionally put his genitalia on any of the victims. The defendant testified, "I wouldn't call any of them liars, I would say that perhaps in their mind they perceived it that way, but that's not what was being done."

During his direct examination, the defendant attempted to explain his actions toward each victim. The defendant testified, in regard to Carolyn Grant, that he had to touch her breast to listen to her heart. The defendant denied ever inserting his finger into Sandra Harley's vagina. He denied touching Brenda Mullinax for the purpose of sexual gratification. The defendant reviewed the EKG chart of Jamie Hunt and testified that it was not consistent with that of a patient under stress. In explaining his actions toward Kathy Ritner, the defendant testified that it was medically necessary to palpate her lower back, near her rectal area, in order to properly diagnose her condition. The defendant also testified that it was necessary to touch the breasts of Sharon Roberts in order to listen to her heart, and he denied doing so for sexual gratification. The defendant opined that Roberts may have believed otherwise but "that's not what occurred." Regarding Melissa Martin, the defendant explained that she had a bulging disc in her back and therefore it was necessary to palpate very low on her back, including her buttocks.

Turning to his treatment of Amanda Pritchett, the defendant testified he had treated her and other members of her family for a number of years. He denied ever touching Pritchett for sexual gratification. The defendant denied rubbing Pritchett's vaginal lips and offered that Pritchett's recollection was mistaken if she believed otherwise. As for Pritchett's allegations that he improperly touched her breast, the defendant testified that he had very extensive training in cardiac surgery and cardiology and therefore he would "take much more interest in listening to your heart than anyone else in town."

In recalling his encounter with Patrice Schermerhorn, who posed as "Teresa Price," the defendant said he was surprised during her visit when Schermerhorn told him, "I'm here to chat." The defendant testified that Schermerhorn told him she was a "party girl" and a friend of Amanda Pritchett. He also recalled viewing the videotape of Schermerhorn's visit and acknowledged that he was embarrassed by his behavior on the tape. The defendant apologized to his family and offered no excuse for his conduct toward Schermerhorn.

The defendant next testified concerning the events on the day of his arrest. He related how he was arrested at his office by Detective Matthews and Agent Jordan and taken, in handcuffs, to the justice center for questioning. The defendant denied ever telling the officers that he had touched

female patients for sexual gratification. The defendant also denied that he had "hunched" on female patients' legs or had made unwanted advances.

Other witnesses testifying for the defense included Karen Franklin, a nurse employed by the defendant during much of the time at issue. Franklin testified that she remembered Jamie Hunt as being calm when she underwent the EKG and also that the defendant was very thorough in conducting cardiac examinations and often discovered heart murmurs in patients. Franklin also recalled Brenda Mullinax complaining about the defendant's conduct. Franklin testified that she told the office manager about Mullinax's complaints. The defendant's daughter, Stephanie Denton, also testified, offering that the defendant was "a very affectionate person" and also a "very touchy person." Several character witnesses also testified to the defendant's good reputation in the community.

Based on this evidence, the defendant was convicted of: sexual battery on Amanda Pritchett (committed during her first visit to the defendant); sexual battery by an authority figure on Amanda Pritchett (for the second incident in which she carried the concealed camera); assault on Agent Patrice Schermerhorn;[2] sexual battery on Jamie Hunt; two counts of assault on Melissa Martin; two counts of sexual battery on Kathy Ritner; sexual battery on Brenda Mullinax; and sexual battery on Sharon Roberts. The jury acquitted the defendant on three charges of rape involving Jamie Hunt, Melissa Martin and Sandra Harley and also acquitted on three counts of sexual battery involving Kathy Ritner and Carolyn Grant.

## ANALYSIS

### I. Consolidation and Severance of Offenses

#### *Standard of Review*

Decisions concerning consolidation and severance of offenses pursuant to Rules of Criminal Procedure 8(b), 13 and 14(b)(1) will be reviewed for an abuse of discretion. State v. Toliver, 117 S.W.3d 216, 231 (Tenn. 2003); Spicer v. State, 12 S.W.3d 438, 442 (Tenn. 2000); State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). An abuse of discretion in this context implies that the trial court applied an incorrect legal standard or reached a decision against logic or reasoning which caused an injustice to the complaining party. Spicer, 12 S.W.3d at 443; Shirley, S.W.3d at 247.

#### *Tennessee Rules of Criminal Procedure 8, 13 and 14*

---

[2] This conviction was later reversed by the Court of Criminal Appeals for failure to instruct the jury on the defense of consent. The State did not appeal the reversal, and we do not consider it further.

Consolidation of multiple offenses against a single defendant for a single trial is governed by Rules 8, 13, and 14 of the Tennessee Rules of Criminal Procedure. The interaction of these rules has been previously analyzed by this Court in a recent line of cases. See State v. Toliver, 117 S.W.3d 216 (Tenn. 2003) (involving a defendant charged with child abuse in two separate indictments, with the trial court consolidating these indictments for a single trial); Spicer v. State, 12 S.W.3d 438 (Tenn. 2000) (defendant  charged under two separate indictments which were consolidated in a single trial); State v. Moore, 6 S.W.3d 235 (Tenn. 1999) (involving a single indictment charging multiple offenses, with the defendant requesting that certain offenses be severed and tried separately); State v. Shirley, 6 S.W.3d 243 (Tenn. 1999) (defendant charged with multiple offenses in single indictment and requested offenses be tried separately). In the case before us today, the defendant was charged with multiple offenses in each of three separate indictments, and these indictments were then consolidated and for a single trial.

Rule 8(b) of the Tennessee Rules of Criminal Procedure provides that "[t]wo or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character." Tenn. R. Crim. P. 8(b). Rule 13(a) gives the trial court the option to consolidate two or more indictments for trial if the offenses could have been joined in a single indictment pursuant to Rule 8(b). Tenn. R. Crim P. 13(a). Rule 13(b) allows the trial court the option of severing offenses for trial if either the prosecution or the defendant could have obtained a severance under Rule 14. Tenn. R. Crim. P. 13(b). Finally, Rule 14 provides that where "two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a *right* to a severance of the offenses unless the offenses are part of a common scheme or plan *and* the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim P. 14(b)(1) (emphasis added).

In short, these rules interact to allow the prosecution, under Rule 8(b), to consolidate similar charges against one defendant into one indictment and to be heard in one trial. Also, the prosecution can request the trial court to consolidate, pursuant to Rule 13, other indictments for trial if they constitute parts of the same "common scheme or plan" or are the "same or similar" crimes as others with which the defendant is charged. However, if the defendant objects to consolidation or moves to sever the offenses for trial, then Rule 14(b)(1) places the burden on the prosecution to show that the offenses are part of a common scheme or plan *and* the evidence of each crime would be admissible in the trial of the other. Spicer, 12 S.W.3d at 443. Thus, under Rule 14(b)(1), in addition to showing that the offenses are part of a common scheme or plan, there is also a question of evidentiary admissibility that must be addressed. Id. at 445 (citing Moore, 6 S.W.3d at 239 (Tenn. 1999)). Therefore, before consolidation is proper the trial court must conclude that: (1) the offenses are part of a common scheme or plan; (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission would have on the defendant, Tenn. R. Evid. 404(b)(3); Spicer, 12 S.W.3d at 445 (citations omitted). For example, evidence of other offenses that tends to show a defendant's character or propensity is generally not admissible, as it invites the fact-finder to infer guilt from propensity. Tenn. R. Evid. 404(b).

However, such evidence may be admissible for other purposes such as to prove motive, intent, identity, the absence of mistake or accident, or the existence of a larger continuing plan. See Toliver, 117 S.W.3d at 230 (citing State v. Gilliland, 22 S.W.3d 266, 271 n.6 (Tenn. 2000)).

### *Common Scheme or Plan*

Turning to the first part of the test under Rule 14(b), there are three types of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. Shirley, 6 S.W.3d at 248. The parties agree that the offenses charged against the defendant are not all part of the same criminal transaction. Therefore, before consolidation is proper the offenses must fall into one of the other two categories.[3] The State asserts, for the first time in this Court, that the offenses charged against the Defendant fall under the second category, as they are part of a larger, continuing plan. Initially however, in both the trial court and the Court of Criminal Appeals, the State relied on the distinctive design or "signature" crimes category to support consolidating the offenses. The State argued at the pre-trial hearing that the crimes alleged against the defendant were so factually similar as to "constitute[] a fingerprint" of the defendant and exhibit his "crowning modus operandi." The trial court agreed, holding that the offenses, when considered together, "told a story." We will address both arguments.

We have previously held that the test for finding "signature" crimes is "'not whether there was evidence that a defendant committed both crimes, but whether there was *a unique method* used in committing the crimes.'" Moore, 6 S.W.3d at 241 (quoting Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978)). Under such circumstances, "'the modus operandi employed must be so unique and distinctive as to be like a signature.'" Id. at 240 (quoting State v. Carter, 714 S.W.2d 241, 245 (Tenn. 1986)). The evidence of the other offenses must have such unusual particularities and be "'*so unique* that proof that the defendant committed the other offense fairly tends to establish that he also committed the offense with which he is charged.'" Id. (quoting Bunch v. State, 665 S.W.2d 227, 231 (Tenn. 1980)). However, simply because the defendant may have committed a series of crimes "'does not mean that they are part of a common scheme or plan.'" Id. at 241 (quoting State v. Peacock, 638 S.W.2d 837, 840 (Tenn. Crim. App. 1982)).

We do not find the offenses here are so factually unique or distinctive as to constitute the defendant's modus operandi. While there are certainly similarities among the allegations, these similarities are simply that all of the incidents were sexual assaults by a physician against a patient. Even though the defendant is alleged to have touched the women in a sexual manner while examining them in his office, the circumstances of each encounter are not "so unique and distinctive as to allow one to conclude that if [the defendant] committed [one] offense, then he also must have

---

[3] As we stated in Spicer, a motion to consolidate offenses is typically a pre-trial motion with evidence tending to support or negate the propriety of consolidation being presented at a pre-trial hearing. Spicer, 12 S.W.3d at 445. Consequently, in reviewing the trial court's decision to consolidate the offenses, we necessarily look to the evidence presented at the pre-trial hearing, "along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses." Id.

committed the [other] offenses as well." Moore, 6 S.W.3d at 241-42. Nothing makes these acts so unique "that reasonable men can conclude that it would not likely be employed by different persons." Tolliver, 117 S.W.3d at 229. Therefore, the offenses do not evidence a distinctive design nor are they "signature" crimes of the defendant.

Furthermore, even assuming arguendo that these offenses were all "signature crimes," they still could not be consolidated unless evidence of one was admissible upon the trial of the others. Tenn. R. Crim. P. 14(b)(1). Indeed, we have previously held that when the theory of common scheme or plan is grounded upon a distinctive design or "signature" crime, usually the only reason to allow admission of other offenses is to establish the identity of the defendant. Moore, 6 S.W.3d at 239. In the case before us identity is not an issue. Therefore, instead of using the signature crime theory to establish that the defendant was the perpetrator of the crimes, the State apparently sought consolidation of the offenses simply in an effort to bolster the testimony of each individual victim through the accumulated testimony concerning other unrelated allegations. For instance, at the pre-trial hearing, the State argued for consolidating the offenses by stating that there was no way for the victims "to [be] corroborate[d] based upon the actual treatment given because of that one on one situation that the doctor put them in." The State also seemed to admit as much at trial when the prosecutor stated that what made one of the victims believable was the "pattern" of crimes alleged against the defendant. Therefore, the offenses are not materially relevant to each other except to show the jury that the defendant has been charged with a string of similar crimes. Such propensity evidence infringes on the defendant's right to a fair trial by inviting "the trier of fact to improperly infer that the defendant has a propensity to commit crimes." Id. at 239; see also Tenn. R. Evid 404(b).

The State also argues, for the first time in this Court, that the defendant's acts constitute a common scheme or plan because they are part of a larger, continuing plan or conspiracy. Although the crimes all involved sexual misconduct and contained some similarities, a larger, continuing plan or conspiracy "involves not the similarity between the crimes, but [rather] the common goal or purpose at which they are directed." State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995) overruled on other grounds, Spicer, 12 S.W.3d at 447. The State submits that the defendant's acts were part of a larger plan that had one single goal – that of achieving sexual release. The argument that sex crimes can be construed as part of a continuing plan or conspiracy merely by the fact that they are committed for sexual gratification has previously been rejected. See Moore, 6 S.W.3d at 240 (stating that two offenses of child rape do not create a larger conspiracy); State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993) (holding that mere fact that crimes were committed for sexual gratification is insufficient to constitute a continuing plan or conspiracy). A larger plan or conspiracy in this context contemplates crimes committed in furtherance of a plan that has a readily distinguishable goal, not simply a string of similar offenses. The State has offered no evidence that the defendant had a working plan operating towards the future such as to make probable the crime with which the defendant is charged. See Hoyt, 928 S.W.2d at 943. Therefore, the offenses charged against the defendant are not part of a larger, continuing plan or conspiracy. Accordingly, because the offenses are not "signature" crimes or part of a larger, continuing plan or conspiracy, we hold that

the offenses alleged against the defendant do not constitute a common scheme or plan and the trial court erred in denying the defendant's motion to sever the offenses for trial.

## II.  Harmless Error Analysis

Having found that the trial court erred in refusing to sever the offenses for trial, we now must evaluate the record to determine if this error appears to have affirmatively affected the outcome of the trial.  Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).  Whether a trial court should grant a severance under Tennessee Rule of Criminal Procedure 14(b)(1) involves primarily an evidentiary question, therefore, "the effect of a denial of that right is weighed by the same standard as other non-constitutional evidentiary errors: the defendant must show that the error probably affected the judgment before reversal is appropriate."  Moore, 6 S.W.3d at 242.  Although the defendant was convicted of assault upon Patrice Schermerhorn, that conviction was later reversed by the Court of Criminal Appeals and we do not consider it in this analysis.  Therefore, we consider the defendant's other convictions, namely: one count of sexual battery by an authority figure; six counts of sexual battery; and two counts of assault.

We have held that the "line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict . . . ."  Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979); see also Spicer, 12 S.W.3d at 447-48.  The State argues that the failure to sever the offenses was harmless as the evidence presented against the defendant was overwhelming.  Further, the State submits that the jury's finding the defendant not guilty on six of the charges and guilty of lesser included offenses on five others shows that the jury independently evaluated each charge.  The defendant counters that the evidence in support of the convictions was far from overwhelming.  Also, the defendant argues that admission of irrelevant evidence of other offenses is inherently prejudicial as it creates a temptation for the jury to convict based solely on a defendant's propensity to commit crimes.

The evidence presented against the defendant at trial consisted of the testimony of nine of the victims, testimony of the father of one victim, testimony of the mother and attorney of one victim, testimony by the investigating officers, and two videotapes of undercover visits to the defendant's office.  Each victim testified that the defendant had touched them sexually and made improper or distasteful comments during their visits. The videotapes showed the defendant touching Amanda Pritchett and Patrice Schermerhorn and also engaging in intimate conversation.  Additionally, Detective Mathews and Agent Jordan testified that the defendant admitted during questioning that he had inappropriately touched female patients' breasts and genitals, that he had made unwanted sexual advances, and that he had previously "hunched" on female patients' legs.

This evidence, taken by itself, could be considered more than sufficient to convict. However, other evidence was presented in support of the defendant that mitigated the State's case.  Several character witnesses testified to the defendant's good reputation.  A nurse testified that one of the victims, Jamie Hunt, had been calm during the time she alleged the assault had occurred.  The defendant's daughter testified that the defendant was an affectionate and a "very touchy" person.

A physician, Dr. Michael Hood, offered his opinion regarding the proper standard of care, each victim's medical diagnosis and treatment, and the appropriateness of the defendant's actions. Dr. Hood testified that occasionally his own "private area" would contact a patient while performing an examination and that it was sometimes necessary to manipulate a female patient's breast when using a stethoscope. Dr. Hood also explained the necessity of touching the lower back and buttocks of patients complaining of back pain. The defendant himself also testified and denied touching any of the victims for sexual gratification. He offered explanations for many of his actions toward the women, addressed each victim's allegations independently, and attempted to explain the medical necessity for most of his actions.

When considered as a whole, the evidence adduced at trial, while clearly sufficient to convict, was not overwhelming. The evidence supporting six of the convictions consisted solely of the victims' testimony. Other than the videotape of Amanda Pritchett's visit, no physical evidence was produced that tended to support any of the allegations. Although the defendant and Dr. Hood offered medical reasons to explain many of the defendant's actions, there was little chance that the jury could have fully and fairly considered these alternative explanations considering the array of multiple charges and testimony that hung in the backdrop as each particular offense was presented by the State.

We can never know how evidence that should not have been admitted truly affected the minds of the jury members. The victims and allegations were so numerous that one can never be sure what evidence tipped the scales regarding any particular charge. It is highly unlikely that the jury was not influenced in some way by the sheer volume of testimony relating to other charges. Under these circumstances, common sense tells us that the jury probably believed the defendant had a propensity to commit such acts and that each victim's testimony was made more credible by similar testimony coming from the others. For these reasons, we find that the error in consolidating the offenses more probably than not affected the verdicts and was not harmless. Therefore, we hold that the defendant's convictions must be vacated and the case remanded for separate trials.[4]

## III. Tennessee Code Annotated section 39-13-527: Sexual Battery by an Authority Figure

Having found that failure to sever the offenses was reversible error, it is also necessary to determine the proper application of Tennessee Code Annotated section 39-13-527 (2003). In the present case we must determine whether a medical doctor, by virtue of his or her professional status, falls within the ambit of Tennessee Code Annotated section 39-13-527(2003), which prohibits sexual battery by an "authority figure." The key issue is whether a doctor exercises "supervisory or disciplinary power" over a patient due to the physician's professional status. This is an issue of first impression for this Court.

---

[4] The defendant also raised the issue on appeal that the enhancement of his sentence by the trial court was unconstitutional under the recent United States Supreme Court decision in Blakely v. Washington, 124 S. Ct. 2531 (2004). However, as we have reversed the defendant's convictions, the sentencing issue is rendered moot and we do not address it.

Because the statute does not define either "authority figure" or "supervisory or disciplinary power," we must rely on principles of statutory construction to ascertain their meanings. We review questions of statutory construction *de novo* with no presumption of correctness given to the lower courts' conclusions. State v. Walls, 62 S.W.3d 119, 121 (Tenn. 2001); State v. Alford, 970 S.W.2d 944, 945 (Tenn. 1998). Courts are to look to the plain language of a statute and give effect to the ordinary meaning of the words. State v. Jennings, 130 S.W.3d 43, 46 (Tenn. 2004); Cohen v. Cohen, 937 S.W.2d 823, 827 (Tenn. 1996). We presume that the legislature purposefully chose each word used in a statute and that each word conveys a specific purpose and meaning. See Jennings, 130 S.W.3d at 46; Bryant v. Genco Stamping & Mfg. Co., 33 S.W.3d 761, 765 (Tenn. 2000). Further, we must "'ascertain and carry out the legislature's intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" Jennings, 130 S.W.3d at 46 (quoting Lavin v. Jordan, 16 S.W.3d 362, 365 (Tenn. 2000)). Only if the plain language of a statute is ambiguous must we look beyond the statutory language to determine the legislature's intent. Id. However, in criminal cases, all ambiguities will be resolved in favor of the defendant. State v. Rogers, 992 S.W.2d 393, 400 (Tenn. 1999).

Sexual battery by an authority figure is defined in Tennessee Code Annotated section 39-13-527 (2003), which states, in part:

(a) Sexual battery by an authority figure is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by the following circumstances:

(1) The victim was, at the time of the offense, thirteen (13) years of age or older but less than eighteen (18) years of age; and either

(A) The defendant had, at the time of the offense, supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used such power to accomplish the sexual contact; or

(B) The defendant had, at the time of the offense, parental or custodial authority over the victim and used such authority to accomplish the sexual contact.

The defendant was charged under this statute based upon his status as the physician of Amanda Pritchett and the fact that Pritchett was seventeen years old at the time she alleged the defendant sexually assaulted her. The defendant appeals his conviction, arguing that the statute does not reach medical doctors as they do not exercise "supervisory or disciplinary power" over patients. The State, in response, argues that the statute applies to doctors because they exercise control over patients' bodies, direct patients during examinations to undress or expose themselves for diagnosis, and patients know they must acquiesce to such directions in order to obtain treatment.

At the outset, it is centrally important to our analysis to note that section 39-13-527 only applies if the victim is between the ages of thirteen and eighteen. Since its enactment in 1997, there have been relatively few prosecutions based upon this statute, and these have, for the most part,

involved parents, teachers, coaches, or relatives of the victim.[5] Such positions carry with them an inherent power to exercise authority over adolescents that is not likewise exercised over adults. In contrast, we find no such distinction can be made between adults and adolescents in the physician/patient relationship. While an adolescent may feel compelled to follow a doctor's orders for health purposes, just as an adult patient might also, this is a far cry from the persuasive, disciplinary conditions present for adolescents in other settings. In the usual course of events, adolescents are required to be under the direct supervision of parents, teachers, coaches, or school officials; they do not have any choice in the matter, and therefore the opportunity for abuse is much greater. It is these situations that we find the statute seeks to address and not that of a patient voluntarily seeking treatment and advice from a physician.

Further, before the statute is applicable, a defendant must exercise "supervisory or disciplinary power" over the victim. Tenn. Code Ann. § 39-13-527 (2003). Ordinary meanings of "discipline" include: (1) order based on obedience to authority, and (2) punishment meant to correct or train. See Webster's II New Riverside Dictionary 198 (Revised ed. 1996). "Disciplinary power," therefore, would be the power to demand obedience through the use or threat of punishment. Clearly, doctors do not have the power to demand obedience through the threat of punishment. However, "supervisory" is a more ambiguous term. Obviously it must mean something different than "disciplinary" or otherwise its inclusion in the statute would be superfluous. According to the dictionary definition, to "supervise" is to "[t]o direct and inspect the work, actions, or performance of: oversee." Id. at 678. "Supervisory power" would therefore mean the power to direct the actions of another. Without question, doctors often direct the actions of their patients, and patients often comply. However, doctors do not, simply by virtue of their professional status, possess an inherent power or authority to do so.

Traditionally, doctors were granted great deference in directing their patients and making decisions for them.[6] Doctors often treated patients like children, and the patients accepted this role.[7] However, the modern ideal views the professional relationship much differently, with the doctor

---

[5] See State v. Parks, No. M2003-02002-CCA-R3-CD, 2004 WL 1936404 (Tenn. Crim. App. Aug. 30, 2004) (defendant was victim's stepfather); State v. Pointer, No. M2003-00893-CCA-R3-CD, 2004 WL 603419 (Tenn. Crim. App. March 26, 2004) (defendant was victim's stepfather); State v. Rainey, Jr., No. M2001-01870-CCA-R3-CD, 2003 WL 21302993 (Tenn. Crim. App. June 6, 2003)(defendant was the victim's school principal and coach) perm. app. denied (Tenn. , Nov. 3, 2003); Tenn. Dept. of Children's Services v. Hoffmeyer, No. M2002-00076-COA-R3-JV, 2003 WL 1092779 (Tenn. Ct. App. Mar. 13, 2003) (defendant was the victim's father); J.W. ex rel. Jeana Watts v. Maury County, No. M2001-02768-COA-R3-CV, 2003 WL 1018138 (Tenn. Ct. App. Mar. 11, 2003) (defendant was the victim's school resource officer); State v. McGill, No. E2001-01074-CCA-R3-CD, 2002 WL 707936 (Tenn. Crim. App. Apr. 24, 2002) (defendant was the victim's teacher), perm. app. denied (Tenn., Sept. 9, 2002); State v. Miller, No. E2000-01867-CCA-R3-CD, 2001 WL 957464 (Tenn. Crim. App. Aug. 23, 2001) (defendant was the victim's father) perm. app. denied (Tenn., Feb. 25, 2002); State v. Trivette, No. E1999-00944-CCA-R3-CD, 2000 WL 1470530 (Tenn. Crim. App. Oct. 4, 2000) (defendant was victim's cousin).

[6] See, e.g, Julie Gantz, State Statutory Preclusion of Wrongful Birth Relief: A Troubling Re-Writing of a Woman's Right to Choose and the Doctor-Patient Relationship, 4 Va. J. Soc. Pol'y & L. 795 (1997).

[7] Id. at 799.

treating the patient more as a client and placing the ultimate control and decision making ability in the hands of the patient.[8] While there may be a great deal of trust inherent in this relationship, with many patients giving great deference to their doctors' recommendations, the authority and power to control the relationship ultimately rests with the patient. Therefore, we do not believe the term "supervisory power" comfortably describes the voluntary deference often given to physicians by their patients.

We also find it instructive that the central purpose of section 39-13-527 is to prohibit sexual battery by an "authority figure." See Tenn. Code Ann. § 39-13-527 (2003). The term "authority" is susceptible to more than one meaning; with accepted definitions including: the power to command, determine, influence or judge; authorization or right; and also, an expert in a given field. Webster's II New Riverside Dictionary 48 (Revised ed. 1996). It has also been defined as the right and power to command, enforce laws, exact obedience, determine or judge. The American Heritage Dictionary of the English Language 89 (10th ed. 1981). In affirming the defendant's convictions, however, the Court of Criminal Appeals characterized the relationship between doctor and patient, not as one of authority, but as one of great trust. Similarly, it has been stated that "[t]here is an inherent trust and confidence which a patient seeking medical care places in the physician and upon which a patient relies in allowing the physician access to the most intimate parts of the body." State v. Tizard, 897 S.W.2d 732, 743 (Tenn. Crim. App. 1994). We are in complete agreement that a doctor holds a position of great trust with his or her patients. However, section 39-13-527 does not address positions of trust; instead, it imposes criminal liability on those who abuse their position as authority figures. It is particularly revealing on this point that at the time section 39-13-527 was enacted an abuse of a position of trust was already addressed in the Tennessee Code as a sentencing enhancement factor in criminal cases.[9] Therefore, the General Assembly must have viewed a position of authority as being different from a position of trust, or there would have been no need to enact section 39-13-527. Accordingly, a position of trust is not synonymous with a position of authority,[10] and a physician is not an "authority figure" as that term is ordinarily defined.

Accordingly, we hold that Tennessee Code Annotated section 39-13-527 (2003) was not intended to apply to the physician/patient relationship. Also, for the reasons stated above, we hold that physicians do not exercise supervisory or disciplinary power over patients merely from the fact of the physician's professional or occupational status.

---

[8] Id. at 801.

[9] See Tenn. Code Ann. § 40-35-114 (16) (2003) (listing an abuse of a position of public or private trust as one of several enhancement factors that a trial court may apply in criminal sentencing).

[10] See, e.g., Ark. Code Ann. § 5-14-124(a)(2) (2003) (person commits first degree sexual assault if the victim is a child and the person is in a position of trust or authority over the victim); Miss. Code Ann. § 97-3-95 (1998) (defendant holds a position of trust or authority over a child); State v. Marcum, 811 P.2d 963, 965 (Wash. Ct. App. 1991) (holding in a child molestation case that a position of trust and a position of authority are not the same thing).

## CONCLUSION

In summary, we hold that the trial court abused its discretion in denying the defendant's motion to sever the offenses for trial. The offenses were not part of a common scheme or plan nor would evidence of one have been admissible upon trial of the others. We also hold that this error appears to have affirmatively affected the verdicts and was not harmless. Additionally, we hold that Tennessee Code Annotated section 39-13-527 (2003) is not applicable to physicians merely because of their professional status and therefore the defendant was inappropriately charged under this statute. Accordingly, the judgment of the Court of Criminal Appeals is reversed, and the defendant's convictions and sentences vacated. This case is remanded to the trial court for new trials. In accordance with the defendant's original motion to sever the offenses, a separate trial will be held for each alleged victim, with all charges relating to that alleged victim being heard at that time.

Costs of this appeal are assessed against the State of Tennessee.

_____
WILLIAM M. BARKER, JUSTICE