IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 11, 2006

**STATE OF TENNESSEE v. CHARLES HALL**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-00119, 20     Arthur T. Bennett, Judge**

---

**No. W2005-01338-CCA-R3-CD  - Filed August 11, 2006**

---

The defendant, Charles Hall, was convicted by a Shelby County jury of two counts of aggravated robbery. For these offenses, the defendant was sentenced as a repeat violent offender to consecutive sentences of life imprisonment without the possibility of parole. On appeal, he argues that: (1) the trial court erred in consolidating the indictments for trial; (2) the trial court erred in sentencing him under the Repeat Violent Offender Act; (3) the evidence was insufficient to support his convictions; and (4) the trial court erred in ordering consecutive sentencing. Following our review of the record and the parties' briefs, we reverse the judgments of the trial court and remand for two separate trials.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

J.C. McLin, J., delivered the opinion of the court, in which Norma McGee Ogle and Alan E. Glenn, JJ., joined.

Robert Wilson Jones (Of Counsel), Shelby County Chief Public Defender; Tony N. Brayton (on appeal) and Timothy Albers and William Robilio (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Charles Hall.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**BACKGROUND**

The defendant, Charles Hall, was charged with two counts of aggravated robbery in indictment 04-00119 and two counts of aggravated robbery in indictment 04-00120. The lower court consolidated the indictments for trial over the defendant's objection. The testimony from the consolidated trial is set out below.

Janice Gordon testified that she was working as a teller at Brighton Bank on February 20, 2003. She arrived at work at 7:30 that morning but stayed in her car because the bank did not open until 8:00. As she was sitting in her car, a man approached with a gun and told her to "give him the keys." Ms. Gordon told the man that she did not have any keys to the bank but she did have car keys. Ms. Gordon recalled that the man was wearing a "pumpkin colored, bubble jacket" with the hood up and a strap covering the lower part of his face. The man held a silver automatic pistol in one hand, and held a surgical glove in his other hand.

Ms. Gordon testified that the man forced her out of her car and around into the passenger seat. She explained that a second man got into the back seat of her car, but she paid him little attention because the first man had the gun. She followed the gunman's orders to hand over her car keys, money, and jewelry, including her diamond cluster ring and engagement ring. Using the surgical glove to hold the keys, the man started the car, but when he did, she jumped out of the car and ran away. After the men left the bank parking lot in her car, Ms. Gordon went into the bank and called the police. About thirty minutes later, the police found her car parked near the bank with her wallet and a twenty dollar bill in the front seat.

Ms. Gordon testified that on March 12, 2003, Sergeant Bell brought a photographic array to her at the bank to see if she recognized the man who robbed her. She explained that she used a piece of paper to crop the pictures to get a better look at the individual's eyes and nose area before identifying the defendant as the robber. She also identified the defendant as the robber at a preliminary hearing and again at trial. Ms. Gordon testified that she was positive of her identification because she had received extensive training in the identification of robbers through her employment at the bank, and she had previously looked at a photographic array from another robbery in which she had been involved. Ms. Gordon testified that after the preliminary hearing she received a call from the owner of a pawn shop, Scot Keller, asking her to come look at some jewelry. The jewelry turned out to be her stolen engagement and diamond cluster rings.

On cross-examination, Ms. Gordon related that the robber was very rude, threatening, and used vulgar language. Ms. Gordon stated that she did not notice any special markings or a scar in the robber's eye.

Officer Milton Gonzalez testified that he located Ms. Gordon's car on the road behind the bank. Officer Gonzalez noticed a twenty dollar bill, a wallet, and an umbrella in the front seat of the car. Officer Cham Payne testified that he worked in the crime response unit the day of the robbery. Officer Payne explained that he photographed and processed the vehicle and its contents. He collected a twenty dollar bill and took it to the property room, but he did not find any fingerprints.

Sherron Jefferson testified that she was working alone at the Wonder Bread Store on February 23, 2003. While she was restocking the shelves in the back, she heard someone enter the store. When she turned around, a silver handgun was pointed at her face. She observed that the man holding the gun was wearing a mustard-yellow, "orange like, bubble jacket" with the collar pulled

up, a black skull cap, and hospital gloves. However, she was only able to see the robber's eyes and nose due to his coverings.

Ms. Jefferson testified that the robber told her to lock the door, turn the sign off, and give him the money out of the register. He also told her to give him the money from her purse. The robber then took her to the back of the store and demanded that she get the VCR surveillance tape. The robber got upset when the tape got stuck. He pulled the VCR from the wall and stepped on it until the tape ejected. The robber then put her in the bathroom and told her not to leave for fifteen to twenty minutes or he would hurt her. Ms. Jefferson stayed in the bathroom for over fifteen minutes before running next door to the fire station at which time the police were called.

Ms. Jefferson testified that Sergeant Bell showed her a photographic array a couple of weeks after the robbery. While looking at the photographs, Ms. Jefferson covered portions of the individual's faces "to see the eyes." After looking at all the pictures, Ms. Jefferson identified the defendant as the man who robbed her. Ms. Jefferson also identified the defendant as the robber at a preliminary hearing and again at trial. She expressed that she was "positive" and "certain" of her identification.

On cross-examination, Ms. Jefferson admitted that a neighborhood boy was in the store at the time of the robbery. Ms. Jefferson described the robber as calm, demanding, and polite. In response to questions, Ms. Jefferson answered that she did not notice any markings or scars in the robber's eyes. On re-direct examination, Ms. Jefferson elaborated that the neighborhood boy was with her in the bathroom after the robber left, but she did not mention him because the boy's mother did not want him involved. Ms. Jefferson also clarified that the robber was not polite but instead demanding. She reiterated that she was certain the defendant was the man who robbed her.

Officer Sherman Bonds testified that he responded to the robbery at the Wonder Bread Store. Officer Bonds stated that he was unable to lift any fingerprints from the VCR. Sergeant William Woodard testified that he was assigned to the Wonder Bread case until a Crime Stoppers tip linked it to the Brighton Bank case. According to Sergeant Woodard, an anonymous tip came in that a Charles Hall of a certain age, sex, and race was responsible for a couple of crimes. Sergeant Woodard then explained that he received another call from the tipster, this time giving more details about the defendant being responsible for the robberies. Based on the tipster's information, Sergeant Woodard searched pawn shops in Shelby County for items pawned by the defendant. During his search, he received word that the defendant had pawned jewelry at Keller's Pawn Shop in Mississippi.

Officer J.B. Bell testified that he investigated the Brighton Bank robbery case and the Wonder Bread Store case. Officer Bell testified that based on the Crime Stoppers tip, he located a photograph of the defendant and created a six-person photographic array that he took to the two victims, Ms. Gordon and Ms. Jefferson. According to Officer Bell, Ms. Gordon said she was "positively sure that [the defendant] was the person [who robbed her]." Likewise, Ms. Jefferson identified the defendant as the robber.

On cross-examination, Officer Bell testified that he initially thought the Brighton Bank and Wonder Bread Store cases might be related because a silver handgun was used in both robberies. Officer Bell elaborated that during that particular month there had been a lot of robberies, but the Brighton Bank and Wonder Bread Store robberies were the only robberies that involved a silver handgun. However, Officer Bell admitted that a silver handgun was not an unusual firearm. Lastly, Officer Bell looked into the defendant's eyes and noticed that his left eye looked off-set and bigger than the right eye. He also noticed that the defendant's left eye had a small scar in it. However, Officer Bell expressed his opinion that these particularities could be easily overlooked.

Scot Keller testified that the defendant had pawned items at his pawn shop sixty to sixty-five times. Mr. Keller pulled his records and noted that the defendant pawned a diamond marquis ring on February 26, 2003 and a diamond cluster ring on March 8, 2003. Mr. Keller testified that he was contacted by the police and asked to hold the two rings, which Ms. Gordon later claimed as hers. Mr. Keller also recalled that sometime after Ms. Gordon claimed the jewelry, he received a call from the defendant inquiring whether Mr. Keller still had the two rings. On cross-examination, Mr. Keller testified that the defendant was a good customer and nothing he had pawned before had been reported as stolen.

Robert Lively testified for the defense. Mr. Lively explained that he ran a security company, Courtesy Consultants, and he had employed the defendant "on and off for two, to three, maybe four years." Mr. Lively brought the defendant's time sheet for the period of the two robberies to trial. The time sheet indicated that the defendant was assigned to an apartment complex, and that he worked 6:00 p.m. to 2:00 a.m. on February 20, 2003 and 1:00 p.m. to 9:00 p.m. on February 23rd. Mr. Lively admitted that the defendant was responsible for filling in the time sheet and that next to February 20th a "minus three" was noted in another handwriting, meaning the defendant missed approximately three radio checks or was not on the property for three hours. On cross-examination, Mr. Lively admitted that he could not verify that the defendant worked every minute of his reported hours and only went by the time sheet.

The last defense witness to testify was Georgia Johnson, the defendant's cousin. Ms. Johnson testified that the defendant has a dark spot in one of his eyes.

The state put on rebuttal proof in the form of testimony from Investigator George Dunlap. Investigator Dunlap testified that he tried to contact someone with Courtesy Consultants at least twice, but he never received a response.

Following the trial, the jury returned a verdict of guilty as charged in indictment 04-00119 to two counts of aggravated robbery, which the trial court merged into one aggravated robbery conviction. The jury also found the defendant guilty of aggravated robbery and the lesser-included offense of robbery as charged in indictment 04-00120, which the trial court merged into one aggravated robbery conviction. The trial court sentenced the defendant as a repeat violent offender to two consecutive life sentences without the possibility of parole.

## ANALYSIS

The defendant raises four issues on appeal: (1) whether the trial court erred in consolidating the indictments for trial; (2) whether the trial court erred in sentencing him as a repeat violent offender; (3) whether the evidence was sufficient to support his convictions; and (4) whether the trial court erred in ordering consecutive sentencing.

### A. Consolidation

The defendant first argues that the trial court erred in consolidating indictments 04-00119 and 04-00120 for trial despite his objection. Prior to trial, the trial court granted the state's motion to consolidate the two indictments against the defendant pursuant to Tennessee Rule of Criminal Procedure 8(b). Tennessee Rule of Criminal Procedure 8(b) provides that two or more offenses may be "consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character." Rule 13 allows the trial court an option to consolidate the offenses if the offenses could have been joined in a single indictment pursuant to Rule 8 or sever the offenses if the prosecution or defense could have obtained a severance under Rule 14. The defendant opposed the state's motion pursuant to Rule 14(b)(1), which provides that "the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others."

The first prong of the two-prong inquiry in Rule 14(b)(1) requires a showing of a common scheme or plan. To establish a common scheme or plan, the trial court must find that (1) the offenses are of distinctive design or signature crimes; (2) the evidence demonstrates a larger continuing plan or conspiracy; or (3) the offenses are part of the same criminal transaction. *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999). The distinctive design or signature category encompasses offenses where the *modus operandi* is so similar, and the offenses occur within such a relatively close proximity in time and location that the same person probably committed both offenses. *State v. Morris*, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990). While the offenses need not be identical in every respect, *Bunch v. State*, 605 S.W.2d 227, 231 (Tenn. 1980), the "methods used in committing the offenses must have such unusual particularities that reasonable men can conclude that it would not likely be employed by different persons." *Moore*, 6 S.W.3d at 240. "[S]imply because the defendant may have committed a series of crimes does not mean that they are part of a common scheme or plan." *State v. Denton*, 149 S.W.3d 1, 14 (Tenn. 2004) (citations and internal quotations omitted).

The second prong of Rule 14(b)(1) requires a showing that the evidence of one offense would be admissible in the trial of the other. To comply with the requirements in the second prong, the trial court must conclude that (1) the evidence of each offense is relevant to some material issue in the trial of the other offense under Tennessee Rule of Evidence 404(b)(2); and (2) the probative value of the evidence of the other offense is not outweighed by the prejudicial consequences of admission under Tennessee Rule of Evidence 404(b)(4). *State v. Hoyt*, 928 S.W.2d 935, 944 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer v. State*, 12 S.W.3d 438, 447 n.12 (Tenn. 2000). In

Tennessee, evidence of other offenses may be admissible to show (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; or (6) a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other. *Id.*

Decisions regarding the joinder and severance of offenses are matters entrusted to the sound discretion of the trial court. *See Spicer*, 12 S.W.3d at 442. On appeal, this court will not interfere with the exercise of that discretion unless it appears from the face of the record that the defendant was prejudiced by the trial court's ruling. *State v. Wiseman*, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982). Moreover, "because the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses." *Spicer*, 12 S.W.3d at 445.

In this case, the trial court conducted a pretrial hearing on motions for consolidation and suppression, during which, Sergeant Bell, Ms. Gordon, and Ms. Jefferson testified. After hearing this testimony and the arguments from both parties regarding consolidation, the trial court reviewed the applicable law and stated:

> As to Rule 14(b) . . . if two or more offenses have been joined, or consolidated for a trial, pursuant to Rule 8(b), the defendant shall have the right to sever[ance] of the offenses, unless the offense[s] [are] part of a common scheme, plan and the evidence of one would be admissible upon the trial of the others.

> Of course, that goes to the common scheme, or plan to show, really, it boils out to identity, that this is the same person that committed the other crime.

> And in this case . . . it appears that something striking here makes it unique. And that is, surgical gloves. That's something that you don't see. That's about the only thing. The coat doesn't carry much weight. It carries some weight, because of the way he wore it. But the fact that it was a coat of that type, you can't say, well he's about the only one that's got a coat of that type. No, that wouldn't happen. Probably a lot of folks got a coat like that and it didn't happen in the same area, anyway. Somebody in that area may have had, maybe not somebody, maybe several people had a coat like that.

> Now, but what really causes this to be very unique, surgical gloves. Maybe I remember some case, maybe years ago, somebody had a surgical glove, but it wasn't a two indictment situation. But, apparently he might not have had the gloves on in one incident, but he had them in his hand, so that's the same as having them on. He had them with him for whatever reason he had surgical gloves. Maybe that's for keeping him from making fingerprints somewhere if he had to touch something. But,

-6-

I think that that [sic] makes it very unique, to show identity, common scheme, or plan to whatever he wanted to have these surgical, rubber gloves out there. Not to keep your hands warm, certainly, in February, in the winter time. But, I think that that [sic] makes it unique.

. . . .

. . . Now, I don't know whether it was this defendant, or not, but the person that was identified as having these surgical gloves on both incidents. And the coat -- when you take that, with the coat, same kind of coat, it really does tell in making the coat more important.

. . . .

So the Court feels that there may be here that they can use that appearance and will rule that they can put that on at this time to show that the plan of the defendant's, as well as the attempt to show identity.

. . . .

The Court is going to allow the state to go ahead based on this situation, I think, because it's a unique situation that's involved in this case concerning the whole common scheme, plan of this defendant, the way he cropped his face in both incidences. The gun being the same. The gloves, something's that very unique, having rubber gloves, or hospital gloves on and having them with him in both instances. And then one time he had them on and one time he had them in his hand.

So the Court's going to allow her to put on -- of course, even that, they're separate and distinct indictments and the state has to prove each and every indictment, as to each of these cases. And the jury looks at the evidence as to both of these cases and make a decision as to whether the state has proven it, as to each of these incidences.

That is the way that the Court will rule on that matter. . . .

Upon review, we conclude that the trial court erred in consolidating the two indictments for trial based on the offenses being part of a common scheme or plan. In our view, the offenses here are not so factually unique or distinctive as to constitute a signature. Looking at the record, some similarities exist between the two offenses. These include the fact that the perpetrator wore some shade of yellow-orange bubble jacket with the collar pulled up over his mouth, had on a head covering pulled down over his forehead, and carried a silver handgun. There was also testimony that the perpetrator held a clear surgical glove in one hand during the Brighton Bank robbery and wore off-yellow surgical gloves during the Wonder Bread Store robbery. However, these similarities are

generic, not unique. To reiterate, the test for finding signature crimes is "not whether there was evidence that a defendant committed both crimes, but whether there was a *unique method* used in committing the crimes." *Denton*, 149 S.W.3d at 14 (citations and internal quotations omitted).

We also note that numerous factual differences exist between the two robberies. For instance, the record reflects that the offenses occurred three days apart, the offenses occurred in different areas of Memphis – approximately ten miles apart, and the offenses occurred at different times of the day. The record further reflects that the Brighton Bank robber used the hood of his jacket to cover his head; whereas, the Wonder Bread Store robber wore a skull cap. The Brighton Bank robbery was in essence a car-jacking and was committed by two individuals; whereas, the Wonder Bread Store robbery was perpetrated by only one individual. The Brighton Bank robber was more aggressive and vulgar than the Wonder Bread Store robber. Again, to be part of a common scheme or plan, the offenses "must be so similar in *modus operandi* and occur within such a relatively close proximity of time and location to each other that there can be little doubt that the offenses were committed by the same person(s)." *State v. Peacock*, 638 S.W.2d 837, 840 (Tenn. Crim. App. 1982). In sum, the two robberies do not evidence unique circumstances and include many differences. Therefore, we are unable to say that a distinct or unique modus operandi was used. Accordingly, we conclude the lower court abused its discretion in consolidating the indictments for trial over the defendant's objection.

We further note that while the trial court did conduct a series of discussions outside the jury's presence regarding whether the evidence of one offense would be admissible in the trial of the other offense, the court failed to specifically analyze the issue under Rule 404(b). The trial court also failed to find on the record whether the probative value of the evidence of the other offense outweighed the prejudicial consequences of admission.

Having determined that the trial court erred in consolidating the indictments for trial, we now must evaluate the record to determine if this error appears to have affirmatively affected the outcome of the trial. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). In looking at the evidence presented at trial, we note that in addition to Ms. Gordon's testimony there was some other evidence indicative of the defendant's guilt in regards to the Brighton Bank robbery. Specifically, the defendant pawned the two rings stolen from Ms. Gordon within days of the robberies.

On the other hand, the predominant evidence linking the defendant to the Wonder Bread Store robbery was Ms. Jefferson's testimony. No fingerprint or other forensic evidence linked the defendant to either of these crimes. The evidence presented at trial, while probably sufficient to convict, could hardly be described as *overwhelming*. Due to this lack of evidence, we are hard pressed to ignore the impact the joining of the witnesses' testimony had on the jury's verdict; especially, in light of the fact the jury, after hearing Ms. Gordon's testimony, more than likely believed the defendant had a propensity to commit the second robbery. For these reasons, we conclude that trial court's error was not harmless. Therefore, we hold that the judgments of the trial court must be reversed and the case remanded for separate trials.

Because of the possibility of further appellate review, we will address the defendant's remaining three issues.

## B. Repeat Violent Offender Status

The defendant argues that he should not have been sentenced under the Repeat Violent Offender Act because he was not notified of his status as a repeat violent offender within forty-five days of arraignment. Under the Repeat Violent Offender Act, defendants convicted of certain violent crimes who have a record of specified prior convictions qualify for an automatic sentence of life without parole. *See* Tenn. Code Ann. § 40-35-120. A charge as a repeat violent offender must be brought to trial within 180 days of the arraignment with certain exceptions.[1] *Id.* § 40-35-120(i)(1). Moreover, the state is required to file with the court and defense counsel a statement that the defendant is a repeat violent offender within forty-five days of the arraignment. *Id.* § 40-35-120(i)(2). The trial court shall grant the defendant a continuance if the notice is not timely filed so that the defendant has forty-five days between the date of notice and the trial. *Id.* The defendant is not entitled to release from custody or dismissal of the charges if the state does not comply with the notice provisions. *Id.* § 40-35-120(i)(3).

In this case, we initially note that the defendant has waived this issue for failing to raise it prior to trial, in a motion for new trial, or during the sentencing hearing.[2] *See* Tenn. R. App. P. 36(a); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). However, even if not waived, the defendant is not entitled to relief. The record reveals that the defendant was indicted on January 8, 2004 and arraigned on January 14, 2004. The prosecutor filed a notice of repeat violent offender status on March 15, 2004. However, the notice was not placed in the defendant's court file due to what must have been a clerical oversight in the court clerk's office. The trial court corrected this error by entering an order to correct the record on February 8, 2006. *See* Tenn. R. Crim. P. 36. We reviewed the numerous transcripts in this case and found no mention of a failure by the state to file notice of repeat violent offender status. Accordingly, in light of the trial court's order correcting the record, we conclude the state's notice of repeat violent offender status was filed approximately sixty days after the defendant's arraignment.

The remedy under the statute for untimely notice is to grant a continuance so that the defendant has forty-five days between receipt of notice and trial. Tenn. Code Ann. § 40-35-120(i)(2). Here, even with the delayed notice, the defendant still had forty-five days notice before his trial began on November 2, 2004. This court has previously determined that the defendant must

---

[1]The exceptions are delay caused by (1) the defendant, (2) a competency examination, (3) a competency hearing, (4) an adjudication of incompetency for trial, (5) a continuance due to the defendant's physical incapacity for trial, or (6) an interlocutory appeal. Tenn. Code Ann. § 40-35-120(i)(1)(A)-(F).

[2] We note that the defendant did raise that he was not brought to trial within 180 days both prior to trial and in his motion for new trial. However, our review of the record reveals that his first challenge to the alleged untimely notice of his status as a repeat violent offender was on appeal.

show he or she was prejudiced due to the untimely notice. *State v. Thompson*, 36 S.W.3d 102, 115-16 (Tenn. Crim. App. 2000). It is our view that the defendant has not shown he was prejudiced by the untimely notice given he had ample time between receipt of the notice and the trial. Therefore, the defendant is not entitled to relief on this issue.

### C. Sufficiency

The defendant next challenges the sufficiency of the convicting evidence. Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

Aggravated robbery is defined as robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). The identity of the defendant as the person who committed the offense for which he is on trial is an element of the offense and a question of fact for the jury. *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). A victim's identification of the defendant as the one who committed the offense is sufficient to establish identity. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

In this case, both victims identified the defendant as the robber after looking at a photographic lineup, at the defendant's preliminary hearing, and at trial. Moreover, both victims testified that they were able to clearly see the defendant when he robbed them. Ms. Gordon testified that the defendant was initially two feet away from her. Ms. Jefferson testified that she stood "face to face" with the defendant, no more than an arm's length away.

Additionally, the evidence at trial established that the defendant pawned the two rings stolen from Ms. Gordon within days of the robberies. Also, the defendant cross-examined Ms. Jefferson about a little boy being present in the store during the robbery. However, on re-direct examination Ms. Jefferson testified that she had not told the police or the prosecutor about the little boy's presence. Accordingly, in light of the defendant's burden of proof on appeal, we conclude that, while not overwhelming, the evidence was sufficient for a rational trier of fact to find the defendant guilty.

### D. Consecutive Sentencing

The defendant lastly argues that the trial court erred in ordering his sentences be served consecutively. Specifically, he contends the trial court misapplied the "extensive criminal record category." This court's review of a challenged sentence is a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments.

In conducting our de novo review of a sentence, this court must consider (a) the evidence adduced at trial and the sentence hearing; (b) the pre-sentence report; (c) the principles of sentencing; (d) the arguments of counsel as to sentencing alternatives; (e) the nature and characteristics of the offense; (f) the enhancement and mitigating factors; and (g) the defendant's potential or lack of potential for rehabilitation or treatment. *Id.* §§ 40-35-103(5), -210(b).

Initially, we note that if a defendant is convicted of more than one criminal offense, a trial court may impose consecutive sentencing upon a determination by a preponderance of the evidence that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. Below is the statutory criteria the trial court found relevant to this case:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

. . . .

(6) The defendant is sentenced for an offense committed while on probation[.]

*Id.* § 40-35-115(b). The statutory criteria set forth in Tennessee Code Annotated section 40-35-115(b) are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

In ordering the consecutive sentences, the trial court concluded:

He [has] offenses in several states at least two other states where he committed violent offenses, and in Tennessee numerous violent offenses. . . .

. . . .

. . . [H]e's got a horrendous record here. Horrendous record[.] [I]t's one of the worst I've seen in the violent category, you know, aggravated robberies in several states and numerous cases aggravated robbery. So he made a career of that of doing those things. . . .

. . . [H]e's committed these offenses and his horrible record for violent offenses and total disregard for the law over the years, each time he gets out, he commits some more violent offenses.

. . . .

He is a professional criminal who has devoted himself to criminal acts as a major source of livelihood. He has to, to have committed that many offenses. The little work he did was part-time compared to his full-time job of robbing folks. So the Court finds that he is a professional criminal and his offenses, his record is extensive, and, of course, he was sentenced to an offense while on parole so those matters indicate that consecutive sentences are appropriate, and the Court will run them consecutive. . . .

To begin, the defendant only challenges application of factor two, that his record of criminal activity is extensive. Therefore, we will address his argument before analyzing the overall validity of consecutive sentencing in this case. The defendant argues that the trial court erred in ordering consecutive sentencing based upon his past extensive criminal record. The defendant argues that the "extensive criminal record category" set forth in Tennessee Code Annotated section 40-35-115(b)(2) is not applicable to his situation because this category refers to a consideration of the extensiveness of an offender's present convictions, not past criminal record. The defendant argues that his past criminal record formed the basis for a sentence based upon a persistent offender status but did not form the basis for consecutive sentencing. The defendant cites the Sentencing Commission Comments to Tennessee Code Annotated section 40-35-115 and *Gray v. State*, 538 S.W.2d 391 (Tenn. 1976), as support for his argument.

We note the defendant's contention has previously been addressed by this court in *State v. Palmer*, 10 S.W.3d 638 (Tenn. Crim. App. 1999). In *Palmer*, we held that the "extensive criminal record category" applied to offenders with an extensive history of criminal convictions and activities, not just to offenders with extensive present convictions. *Id.* at 648-49. The *Palmer* court based its holding on *stare decisis*, recognizing that for eight years the courts had interpreted section 40-35-115(b)(2) to refer to both a defendant's prior record and present convictions. *Id.* Accordingly, this issue is without merit.

Turning now to the appropriateness of consecutive sentencing, we note the trial court was incorrect in applying factor six (6) because the defendant was on parole, not probation, when he committed the offenses in question. This court has previously determined that the terms "probation" and "parole" are not synonymous for purposes of Tennessee Code Annotated section 40-35-115. *See State v. Robert Sanford Barnes*, No. W2003-02967-CCA-R3-CD, 2005 WL 331376, at *13 (Tenn. Crim. App., at Jackson, Feb. 11, 2005). Despite the trial court's misapplication of factor six, the other factors cited by the trial court provide ample justification for consecutive sentencing.

First, the defendant's record shows that he is a professional criminal. According to the pre-sentence report, the defendant's criminal behavior began when he was sixteen years old. Since that time, the defendant has acquired eight armed robbery convictions in Tennessee, two aggravated robbery with a firearm convictions in Arkansas, a robbery conviction in Arkansas, and a robbery with a deadly weapon conviction in Mississippi. The pre-sentence report also reveals that the defendant's only employment history was with the security company, Courtesy Consultants, which the company owner testified was "on and off." The trial court determined that the defendant's full-time job was "robbing folks," and the record supports that determination.

Second, the defendant has an extensive record of criminal activity. As mentioned earlier, the defendant has at least eleven convictions for armed robbery, as well as a plethora of more minor offenses. Here, the trial court determined the defendant's record to be "horrendous." Our review of the record supports that determination.

In his brief, the defendant also mentions another consecutive sentencing factor: "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). We note the trial court did not base its decision on this factor; therefore, we do not find it necessary to address whether the factor would apply to this defendant especially in light of our aforementioned conclusions.

**CONCLUSION**

Following our review, we reverse the judgments of the trial court and remand for separate trials based on the erroneous consolidation of the two indictments. Additionally, due to the possibility of further appellate review, we also conclude that the defendant is not entitled to relief on his sufficiency and sentencing issues.

_____

J.C. McLIN, JUDGE