# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 18, 2013 Session

## STATE OF TENNESSEE v. DUSTIN SHAWN PRICE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2681      Seth Norman, Judge**

**No. M2012-00117-CCA-R3-CD - Filed August 26, 2013**

The defendant, Dustin Price, was convicted by a Davidson County Criminal Court jury of first degree felony murder, first degree premeditated murder, two counts of reckless endangerment, and three counts of attempted first degree murder.   The two first degree murder convictions were merged, and the defendant received an effective sentence of life plus 40 years in the Department of Correction.  On appeal, he argues that the trial court erred by:  (1) denying his motion to sever offenses; (2) admitting jail house recordings of his telephone conversations with a Davidson County Jail inmate; (3) allowing the prior testimony of a witness under Tennessee Rule of Evidence 803(26); and (4) ordering consecutive sentencing.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Rob McKinney, Nashville, Tennessee, for the appellant, Dustin Shawn Price.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Renee R. Erb and Sarah N. Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of two shootings that occurred in Hermitage on March 26 and March 29, 2008.  On March 26, Todd Tinnin and Patrick Fielder were inside a home on South Graycroft Avenue when someone wearing a Halloween mask and traveling in a gold-

colored car fired multiple 9-millimeter gunshots at the house. On March 29, Heather Silas, her boyfriend, Aaron Dixon, two other women, Megan Ryman and Kimberly Martin, and Silas' young daughter were inside a home on Linden Green when someone in a gold Nissan Altima fired multiple 9-millimeter gunshots into the home, which killed the pregnant Silas and injured Dixon. The defendant was developed as a suspect in both cases, as well as in a third shooting that occurred on November 11, 2008, in which two men, Mario Brooks and Robert Earle, Jr., were shot and injured by a .45-caliber pistol while traveling in a vehicle at New Hope Road and Central Pike.

Based on all those incidents, the Davidson County Grand Jury returned a sixteen-count indictment in which it charged the defendant for offenses arising out of the March 26 shooting, the defendant and a co-defendant, Christopher Alexander, for offenses arising out of the March 29 shooting and a March 30 traffic stop in which the defendant was the driver and Alexander his passenger, and the defendant for offenses arising out of the November 11 shooting. Specifically, the defendant was charged with the March 26, 2008 attempted first degree premeditated murders of Samuel Todd Tinnin and William Patrick Fielder (Counts 1 and 2), the November 11, 2008 attempted first degree premeditated murders of Robert Wilson Earle, Jr. and Mario Dwayne Brooks, Jr. (Counts 11 and 12), the November 11, 2008 possession of drug paraphernalia (Count 13), being a felon in possession of a firearm on November 11, 2008 (Count 14), the November 11, 2008 possession of a firearm with the intent to employ it during a criminal offense (Count 15), and the November 11, 2008 employment of a firearm during the commission of or attempt to commit a dangerous felony (Count 16). The defendant and his co-defendant[1] were charged with the March 29, 2008 first degree premeditated and felony murders of Heather Silas (Counts 3 and 4), the March 29, 2008 attempted first degree premeditated murders of Aaron Dixon, Megan Ryman, and Kimberly Martin (Counts 5, 6, and 7), the March 30, 2008 possession of .5 grams or more of a Schedule II controlled substance with the intent to sell or deliver (Count 8), the March 30, 2008 possession of a firearm with the intent to go armed during the commission of a dangerous felony (Count 9), and being a felon in possession of a handgun on March 30, 2008 (Count 10).

On May 26, 2010, the defendant filed a motion to sever the three sets of offenses, arguing that they were unrelated, that evidence of each would be inadmissible at the trial of the others, and that trying them together would result in unfair prejudice to his defense. At the September 10, 2010 hearing on the motion to sever, retired Hermitage Police Department Homicide Detective Clinton Vogel testified that he first became involved in the case when

---

[1] The record in this case contains a motion by the defendant's co-defendant, Christopher Alexander, to sever his case from the defendant's. There is no order on that motion in the record, but it was apparently granted.

he was called to respond to the March 29, 2008, 10:30 p.m. shooting on Linden Green. In that case, a pregnant woman, Heather Silas, was killed and her boyfriend, Aaron Dixon, was injured when individuals pulled up in front of the house in a gold-colored Nissan or Honda and sprayed the house with 9-millimeter bullets. Two other women, Megan Ryman and Kimberly Martin, were in the residence at the time of the shooting but were not injured. The house was "absolutely riddled" with bullets, and officers recovered twenty spent shell casings and seven projectiles from the scene.

Detective Vogel testified that Dixon and one of the two female victims gave him the name of the defendant as a suspect, with both of them informing him that the defendant had accused Dixon of having committed a home invasion/armed robbery at the defendant's home three or four days earlier, in which he had duct-taped the defendant's sister and her friends. Dixon also told him that the defendant drove a gold Nissan Altima, and Detective Vogel subsequently learned that the defendant had access to a gold Nissan Altima that was registered to his seventeen-year-old sister, Amy Price. Detective Vogel stated that the defendant was stopped in that vehicle on March 30. Inside the vehicle, officers found a live 9-millimeter round, a baseball bat, a hammer, plant material that appeared to be marijuana, a white powder substance, a loaded pistol, a "large grotesque Halloween mask," blue rubber gloves, a blue whiskey bottle bag, and a second loaded firearm that was "secreted underneath a panel."

Detective Vogel testified that he first learned about the March 26 shooting from a fellow detective to whom the case had been assigned. In that case, an individual wearing a "really ugly scary Halloween-type mask," similar to the one recovered from the defendant's vehicle, was seen walking with a TEC-9 machine pistol toward the rear of a house on South Graycroft and firing numerous shots at the house. A witness reported that a gold-colored automobile was parked near his house at the time of the shooting, and the witness identified the defendant from a photographic lineup as one of the perpetrators. On the night of the Linden Green shooting, the house on Graycroft was set on fire.

Detective Vogel testified that during the course of his investigation, a man named Mario Brooks came forward to inform the detectives that Christopher Alexander had sold a TEC-9 pistol to one of Brooks's acquaintances, telling the purchaser that there were "two bodies on it," which was street terminology meaning that the weapon had been used in two murders. Brooks told the detectives that his acquaintance had been stopped by the police, who had recovered the gun. He also told the detectives that he had spoken to the defendant on the night of the March 29 shooting and that the defendant and Christopher Alexander had admitted their involvement in the shooting.

Detective Vogel testified that Brooks was "extremely afraid" of the defendant and "let

-3-

[the detectives] know under no uncertain terms that he feared for his well-being, if not his life." He said that on November 11, 2008, a few weeks after Brooks's interview with the detectives, Brooks and a companion were shot and wounded while traveling in the early hours of the morning at the intersection of Central Pike and South New Hope. When he responded to the scene, Brooks told him that the defendant had pulled up beside him in another vehicle and "started popping caps."

Later that same day, officers arrested the defendant at the home of Velda Spain, who was the mother of Bobby Spain, a close friend of the defendant's. During that arrest, they recovered some long guns, a bulletproof vest, digital scales, and a .45-caliber semi-automatic pistol that was subsequently matched to spent .45-caliber shell casings recovered from the scene of the Central Pike/South New Hope shooting. Ballistics testing also matched the 9-millimeter shell casings from the Graycroft and Linden Green shootings and the live 9-millimeter round recovered from the defendant's car to the TEC-9 pistol that Brooks said had been sold to his acquaintance by Christopher Alexander.

Detective Vogel further testified that he had listened to five or six recorded telephone conversations between the defendant and Bobby Spain, which were made on March 26 and March 27, 2008, when Spain was in jail. He said in those conversations, the defendant and Spain discussed the Graycroft and Linden Green shootings and the defendant "was definitely looking for [Aaron] Dixon." On cross-examination, Detective Vogel testified that he was unaware of any connection between the March 26 Graycroft shooting and the March 29 Linden Green murder other than that the same weapon was used in both shootings and that there was a social connection between some of the victims. On redirect examination, however, he recalled that during his recorded conversations with Spain, the defendant mentioned that he was looking for not only Aaron Dixon but also Patrick Fielder, who was one of the victims of the March 26 Graycroft shooting. According to Detective Vogel, the defendant expressed his belief that Fielder had been involved with Dixon in the robbery of his sister. Detective Vogel also recalled that Brooks told him that the defendant was searching for the TEC-9 weapon and believed that Brooks had it.

On February 9, 2011, the trial court entered an order denying the defendant's motion to sever the offenses. However, on May 20, 2011, the trial court severed Counts 11-16 of the indictment, which were based on the November 8 shooting, and ordered that the defendant proceed to jury trial on Counts 1-7 of the indictment. That same day, the defendant pled guilty in Count 8 to possession of .5 grams or more of a Schedule II controlled substance and in Count 9 to felony possession of a weapon. Count 10 of the indictment was dismissed.

It is unnecessary for us to review much of the trial evidence in detail, as the essential

information about the crimes was set forth by Detective Vogel in the hearing on the motion to sever. We will, therefore, summarize only the testimony and evidence that will further an understanding of the somewhat convoluted facts of the case and that is pertinent to the issues raised on appeal.

Todd Tinnin, one of the victims of the Graycroft shooting, was at the residence early on the morning of March 26 with his girlfriend, his girlfriend's daughter, and Patrick Fielder when he heard footsteps on the gravel outside, opened the door, and encountered a man wearing a red mask. As he was confronting the masked man, Tinnin looked down the road and saw the defendant standing beside the open passenger door of a gold car. The next thing he knew, the defendant fired several gunshots, one of which struck a grill and narrowly missed hitting him. Tinnin did not report the shooting until the house was set on fire a few days later, when he mentioned it to a fire marshall. The fire marshall then brought in a police detective, who interviewed Tinnin and showed him a photographic lineup from which he identified the defendant as the shooter.

Investigator Michelle Ray of the Davidson County Sheriff's Department, who said she was "the point of contact for the inmate phone system," explained the automated computer system that recorded each Davidson County Jail inmate's telephone calls and how she was able to search for and retrieve recordings of telephone calls that had been placed to the defendant's cell phone, as well as those which had been made using the PIN number that had been assigned to inmate Bobby Spain. She said the calls to the defendant's cell phone had been placed using both Spain's PIN number and the PIN number of another inmate who had been housed with Spain in the Davidson County Jail at one time but who was no longer incarcerated at the facility when the phone calls were made. Investigator Ray identified the CDs of those telephone calls, which were admitted as exhibits at trial and played for the jury following Detective Vogel's testimony identifying the defendant's voice on the tapes. In the recordings, which are somewhat difficult to understand, the defendant related what happened during the Graycroft shooting, including his having fired at Tinnin outside on the deck and struck a grill beside him, and his intentions to locate and kill Dixon.

Two of Aaron Dixon's friends described how the defendant had been searching for Dixon in the days before the March 29 shooting and how Dixon had been acting nervous and scared of the defendant.

The two women who were in the house with Dixon and Silas at the time of the March 29 shooting described the multiple gunshots that were sprayed into the living room and the front bedroom of the home and how they sought refuge by jumping into the bathtub. Megan Ryman testified that she heard one long series of gunshots, a pause as if the shooters were turning their vehicle around at the end of the dead-end street, and a second long series of

-5-

gunshots. Kimberly Martin testified that she and the other three adults in the house were sitting in the living room when the gunshots started. She said she initially hit the floor and then ran toward the bathroom, while Silas ran straight toward what she assumed was her child's bedroom. Martin, like Ryman, described hearing an initial long series of gunshots, a pause as if a car were turning around, and then another series of gunshots.

One of the defendant's friends, Rachel Stanley, explained that the events that occurred in the case started when she was with the defendant's sister, Amy Price, and another friend at their Antioch home and three men she had never seen before, two of which were armed with guns and one with a baseball bat, entered, duct-taped them, ransacked the house looking for drugs, took their cash and some other small items, and threatened that they were going to kill the defendant. She said the defendant was very angry about the incident and ranted throughout the next week that he was going to "fuck somebody up." After the Graycroft shooting, she overheard the defendant say that he had laid in wait outside Patrick Fielder's home and fired gunshots at him from a position underneath the house. On the day after the Linden Green shooting, the defendant told her that he had "fucked up" and that "somebody died."

Mario Brooks was called to the stand and pled the Fifth Amendment when asked his age. He then answered "no" to a series of questions including whether he wanted to tell the prosecutor if he knew the defendant, if he had given a recorded statement to police, and whether he wanted to talk about what was in his statement. After a jury-out hearing, the trial court ruled that the State could introduce parts of Brooks's videotaped statement to police under Tennessee Rule of Evidence 803(26) as a prior inconsistent statement. The State then resumed questioning Brooks, who at first testified that he did not remember giving a statement to police. When then asked about whether he had made specific statements during the interview, he replied at various times that he did not remember, that he did not think so, that the statement was not true, that he had not said certain things, or that yes, he had made the statement.

During his testimony, Brooks acknowledged having said that the defendant told him that he had "shot up" the Graycroft and Linden Green houses and that the defendant had asked him to provide him with an alibi for the Linden Green murder. On cross-examination, he acknowledged having told the police that Christopher Alexander had sold the TEC-9 gun to his (Brooks's) brother for $150. On redirect and recross examinations, he testified that he did not tell the police the truth and made the statement at the request of his brother, who was in trouble with the law at the time.

The State later recalled Detective Vogel, who identified the CD of his interview with Mario Brooks. The State then played a brief portion of the tape, which, according to the

prosecutor, contained only those statements that were inconsistent with Brooks's trial testimony. The tape was not admitted as an exhibit and is not in the record before this court.

The defendant's sister, Amy Price, testified on the defendant's behalf that the defendant was with her at a party during the time of the Linden Green murder. Detective Vogel, who was recalled as a rebuttal witness for the State, testified that Price told him in an interview after the murder that the defendant had called her at about the time of the Linden Green shooting and that, during the call, she had heard the sound of at least fifteen gunshots and the defendant yelling over the phone, "This is for you."

## ANALYSIS

### I. Denial of Motion to Sever Offenses

As his first issue, the defendant contends that the trial court erred by not severing the counts of the indictment that arose from the two separate shootings, arguing that the record is "void of any proof to indicate the two incidents were actually connected." The State argues that the trial court acted within its discretion in denying the motion after properly determining that the offenses were part of a common scheme or plan and that evidence of each would be admissible at the trial of the others. We agree with the State.

Tennessee Rule of Criminal Procedure 14(b)(1) provides that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others."

> Before a trial court may deny a severance request, it must hold a hearing on the motion and conclude from the evidence and argument presented at the hearing that (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of one of the offenses is relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of the other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008) (citing Spicer v. State 12 S.W.3d 438, 445 (Tenn. 2000)).

There are three categories of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to be considered "signature" crimes; (2)

offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. State v. Shirley, 6 S.W.3d 243, 248 (Tenn. 1999) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.11, at 180 (3d ed. 1995)).

"Decisions concerning consolidation and severance of offenses pursuant to [Tennessee] Rules of Criminal Procedure 8(b), 13 and 14(b)(1) will be reviewed for an abuse of discretion." State v. Denton, 149 S.W.3d 1, 12 (Tenn. 2004) (citations omitted). "An abuse of discretion in this context implies that the trial court applied an incorrect legal standard or reached a decision against logic or reasoning which caused an injustice to the complaining party." Id.

The trial court found that the offenses in this case were part of a larger continuing plan or conspiracy and that evidence of each episode would be admissible at the trial of the other. The trial court's ruling states in pertinent part:

> The Court is of the opinion that the offenses charged in each count of the indictment are essentially inseparable. Without explanation of the events as they occur in each of the three incidents, the jury would be utterly confused, thus resulting in significant voids in the state's presentation of the case. See State v. Gilliand, 22 S.W.3d 266, 272 (Tenn. 2000). Basically, a jury would not be able to understand the "big picture" or the events surrounding matters being tried absent a full apprisal of events leading up to and occurring after the most serious of offenses being tried.

> The evidence, including the ballistics analyses, the mask found in the vehicle, the reports of Mr. Brooks and the phone records between the defendant and Mr. Spain all indicate that these offenses were committed in conjunction with one another by the defendant. The admission of other crimes in this matter is necessary to establish motive and design in the illustration of a series of small stories as part of a larger scheme or plan to commit serious offenses. In the opinion of the Court, the probative value of this evidence outweighs the danger of unfair prejudice since it provides a significant contextual background for the case and is not being used as character evidence against the defendant.

We find no abuse of discretion in the trial court's ruling. The evidence at trial was that the two shootings were part of the defendant's larger, continuing plan to hunt down and

kill Aaron Dixon and Patrick Fielder in retaliation for the crimes that he believed they had committed against his sister and her friends. Evidence of each shooting was relevant and admissible at the trial of the other to help the State prove the defendant's intent, plan, and motive, and the probative value of the evidence outweighed the danger of unfair prejudice to the defendant. We conclude, therefore, that the trial court properly denied the defendant's motion for severance of the offenses.

## II. Admission of Jail House Recordings

As his next issue, the defendant contends that the trial court erred by admitting the jail house recordings of his telephone conversations with Bobby Spain. He argues, first, that the evidence did not comply with Tennessee Rule of Evidence 902(11) because the custodian of the records did not testify and, second, that the admission of Spain's conversations violated his confrontation rights under Crawford v. Washington, 541 U.S. 36, 68 (2004), because he was unable to cross-examine Spain about his statements. The State disagrees, arguing, among other things: that the recordings were not hearsay because none of Spain's statements were admitted to prove the truth of the matter asserted; that, even if hearsay, Spain's statements fell within the business records exception; and that the recordings did not violate the Confrontation Clause because none of Spain's statements qualified as testimonial under Crawford.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802.

As an initial matter, we note that the most damaging statements contained in the tapes were those made by the defendant, which were admissible under Tennessee Rule of Evidence 803(1.2)(A) as a "party's own statement which is offered against that party." See State v. William Keith Blackburn, No. M2009-01140-CCA-R3-CD, 2011 WL 2893083, at *11 (Tenn. Crim. App. July 20, 2011) (concluding that defendant's statements on jail house telephone recording were admissible under the party admission exception to the rule against hearsay), perm. app. denied (Tenn. Oct. 19, 2011).

We find it unnecessary to review each of Spain's statements in detail in order to access whether they constituted hearsay or non-hearsay because we agree that, even if hearsay, the statements fell within the business records exception to the rule against hearsay.

-9-

Tennessee Rule of Evidence 803(6), provides in pertinent part:

> Records of Regularly Conducted Activity.–A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) . . . .

In his brief, the defendant asserts that the trial court erred in admitting the recordings because "[n]o custodian of the company that maintains the jail house recordings testified as the custodian," which meant that "[t]he admissibility of the evidence did not comply with Rule 803(6)." His complaint is based on Investigator Ray's testimony that "Global Tel Link" was the jail's "inmate phone service provider." Investigator Ray went on, however, to testify that she and a partner were the custodian of the records of the inmate telephone calls, that they were responsible for pulling the records, and that Global Tel Link was just the company that had "created the system" for the automatic recording of each inmate's telephone call. She also agreed that it was analogous to someone using Quicken software to compile their own records. As such, we conclude that Investigator Ray's testimony satisfied the requirement for the admission of the recordings under the business records exception to the rule against hearsay.

The defendant also argues that the admission of Spain's statements violated his confrontation rights under Crawford. In addressing this claim, we note, first, that although defense counsel raised the confrontation rights argument at trial, the defendant did not include it in his motion for new trial, instead framing the issue only as whether the trial court "erred in allowing the State to introduce recordings or telephone calls without authentication or testimony from the custodian of the records." Issues relating to the admission or exclusion of evidence that are not raised in a motion for new trial are deemed waived on appeal. See Tenn. R. App. P. 3(e).

Regardless, the defendant is not entitled to relief on the basis of this issue. In Crawford, the United States Supreme Court held that testimonial hearsay statements violate a defendant's rights under the federal constitution's Confrontation Clause and are only admissible when the declarant is both unavailable and there was "a prior opportunity for

cross-examination." 541 U.S. at 68. Hearsay is testimonial where it takes the form of "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" or of a statement "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52. We agree with the State that Spain's statements to the defendant, which were made as part of a personal telephone call between friends, did not in any way qualify as testimonial. We conclude, therefore, that the trial court did not err in admitting the telephone recordings.

### III. Admission of Mario Brooks's Prior Inconsistent Statement

The defendant next contends that the trial court erred by allowing the State to introduce the prior testimony of Mario Brooks. He argues, among other things, that Brooks's invocation of his Fifth Amendment rights at trial did not render his prior statement inconsistent, that the trial court "did not properly utilize framework set forth by Rule 803(26)," and that the introduction of the testimony denied him the right to confront the witnesses against him. The State argues, among other things, that the court acted within its discretion in admitting the evidence. We agree with the State.

Turning first to the defendant's argument that Brooks's exercise of his Fifth Amendment rights was insufficient for admission of his interview as a prior inconsistent statement, we note that "[a] trial witness other than the accused in a criminal prosecution may not claim a blanket Fifth Amendment immunity from giving relevant testimony simply because certain questions . . . might elicit incriminating answers." State v. Dooley, 29 S.W.3d 542, 551 (Tenn. Crim. App. 2000). The only question to which Brooks actually invoked his Fifth Amendment rights was the one about his age. To every other question, he answered either "no," that he could not remember, or that the statement in his interview about which the prosecutor asked him was either true or untrue. Thus, we reject the defendant's argument that Brooks's statement should not have been admitted because his testimony was not inconsistent with the statement.

We turn next to the defendant's argument that the trial court failed to follow the proper procedure for the introduction of the statement. Tennessee Rule of Evidence 803(26) provides for an exception to the rule against hearsay for:

> A statement otherwise admissible under Rule 613(b) if all of the following conditions are satisfied:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Based on our review of the record, we conclude that the essential requirements for admission of the evidence under the rule were met. First, Brooks testified at trial and was subject to cross-examination. Second, the statement was apparently a videotaped one. Third, the trial court held a jury-out hearing at which it considered the arguments of counsel, including the prosecutor's argument that the statement was trustworthy because Brooks had voluntarily come forward on his own to give a videotaped statement to police officers at the station. At the conclusion of the hearing, the court ruled that it would allow the prosecutor "to ask Mr. Brooks the questions under Rule 803(26)." Implicit in the court's ruling is a finding that the statement was made under circumstances indicating trustworthiness.

We also reject the defendant's argument that the admission of the videotaped portions of his statement to police violated his right to confront the witnesses against him. Brooks testified at trial, and defense counsel had the opportunity to cross-examine him about his testimony and the statement he made to police. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## IV. Consecutive Sentencing

Finally, the defendant contends that the trial court erred by ordering consecutive sentencing, arguing that none of the factors listed in the consecutive sentencing statute are present in his case. The State argues that the defendant has waived consideration of this issue by failing to provide an adequate record for appellate review. We agree with the State.

The transcript of the sentencing hearing is not included in the record before this court. We, therefore, have no way of knowing on which criteria the trial court based its imposition of consecutive sentencing, or its rationale for doing so. It is the defendant's duty to prepare

a fair, accurate, and complete record on appeal, <u>see</u> Tenn. R. App. P. 24(b), and when necessary parts of the record are not included, we must presume that the trial court's ruling was correct. <u>See</u> <u>State v. Oody</u>, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Accordingly, we conclude that the defendant has waived this issue.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE