IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 9, 2014

## STATE OF TENNESSEE v. NATASHA MOSES BATES

**Appeal from the Criminal Court for Bradley County**
**No. 12-CR-276      Amy A. Reedy, Judge**

**No. E2014-00725-CCA-R3-CD - Filed April 7, 2015**

The defendant, Natasha Moses Bates, was convicted of two counts of felony murder, two counts of aggravated child neglect, and four counts of facilitation of the initiation of the process of manufacturing methamphetamine. The murder charges resulted from the deaths of her five- and three-year-old sons whose bodies were found in her front yard. She received a life sentence for each of the felony murder convictions, a twenty-year sentence for each of the aggravated child neglect convictions, and a three-year sentence for each of the drug-related convictions. The trial court ordered that the two life sentences be served consecutively and the two twenty-year sentences to be served consecutively as well, with these two sets of sentences to be served concurrently with each other and with the drug sentences. On appeal, the defendant argues that the evidence is insufficient to support the convictions; that the court erred by not severing the drug-related offenses from the felony murder and aggravated child neglect offenses; and that the court erred by ordering certain of the sentences to be served consecutively. Following our review, we conclude that the trial court erred in not severing the drug offenses, Counts 5-8, from Counts 1-4, alleging felony murder and aggravated child neglect. Accordingly, we reverse the convictions for Counts 5-8 and remand for a new trial. We affirm the convictions and sentencing for Counts 1-4.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
in Part, Reversed and Remanded in Part**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Richard Hughes, Jr., District Public Defender, for the appellant, Natasha Moses Bates.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; R. Steven Bebb, District Attorney General; and Stephen Hatchett, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

This matter resulted from the deaths of the defendant's sons, R.B., age 3, and L.B., age 5, and the discovery of evidence of the manufacture of methamphetamine at the defendant's residence.

The State's first witness was Nicholas Glen Laney, who was employed by the Bradley County EMS and said that, on June 28, 2012, he responded to a call to the residence of Thomas Kile, the defendant's father. He found one of the victims on the sidewalk in front of the home and the other inside the front door of the residence, both unresponsive. The victims' clothes were soaked apparently with sweat; and R.B. had "warm, . . . pale . . . [a]nd moist" skin, with blue lips and nail beds. No pulse was detected for R.B., but L.B. was still breathing and had a pulse.

Dr. Jeffrey Lynn Miller testified that he was an emergency room physician at the SkyRidge Emergency Room and was the Bradley County Medical Examiner. He described the condition of R.B. when he arrived at the hospital:

> He was obtunded, he was unresponsive, you know, as where we are working on the child, you know, we are starting IV's and we are doing procedures to the child to try and determine his . . . condition. There was no response to anything we did. He was completely unresponsive.

Dr. Miller said that the standard temperature is 98.6 degrees, but R.B.'s was 109.

Dr. Miller did not believe that R.B.'s playing outside could have caused a temperature as high as R.B. had. Carol Hayes Mayo testified that she was on duty at the emergency department at Children's Hospital at Erlanger when L.B. was brought in and that his core temperature was 104 degrees.

Travis Smith testified that he was a patrol sergeant with the Bradley County Sheriff's Office and, on June 28, 2012, responded to a call regarding L.B. and R.B. He said that the EMS technicians already were at the scene and working on the two victims. One was in an ambulance, and the other was being brought out of the house. Initially, he thought it was a drowning call, but the defendant said the incident had occurred on Keith Valley Road. She said she had not called 911 from that location because she did not have a cell phone and had to go to her father's house.

Charles Dewayne Scoggins testified that he was a criminal investigator for the Bradley County Sheriff's Office and responded to the call at 2:44 p.m. to 851 Armstrong Road and immediately went from there to 879 Keith Valley Road, where the defendant was living. At that location, he examined the Slip and Slide and explained its condition:

> What I noticed initially when I got there the slide appeared to be relatively dry with the exception of two very small puddles, all of which had dirt and bugs in it. The ground around the Slip and Slide was dry, there was no wet grass anywhere that I could find, and over all in general the Slip and Slide did not appear to have been used in the recent past.

He first spoke with the defendant at the SkyRidge Medical Center Emergency Room, and she said the victims had been outside, playing on the Slip and Slide and when she returned from the house, they were in the front yard and unresponsive. Because of the "suspicious circumstance" of the incident, he asked, and the defendant consented, to having a blood sample taken from her while still at the emergency room. The defendant returned with him to her residence, and later they went together to the Bradley County Sheriff's Office. She said that she had gone inside her home, while the victims remained outside in the yard, and when she returned twenty to twenty-five minutes later, she found them. She said that she had fixed the victims eggs for breakfast, but Investigator Scoggins found no evidence that eggs had been cooked that morning. Later, she said that she had been inside for thirty to forty-five minutes. He asked her the whereabouts of her cell phone, and she responded she thought it was in her car, which was then in the possession of the sheriff's department. He said that he examined her cell phone and found that it would "ring straight through to the Bradley County 911 Center." The defendant did not explain why her phone had been found in the trunk of her car.

When Investigator Scoggins told the defendant of the autopsy findings, she responded that the information she had previously given was accurate, although it was possible that the victims had been under the front porch instead of in the yard. Later, she said she had found the victims in her car:

> When we were getting close to being finished she did finally admit that she in fact had come out and found both children inside of her car, describing her younger child [R.B.] to be in the front right passenger seat of the vehicle with that seat laid completely back, and that her old[er] son [L.B.] was partially hanging out of the right rear passenger door.

Two search warrants were executed at the defendant's residence. The first, on July 3, 2012, was to conduct a temperature study to determine the maximum temperature in the

-3-

defendant's car, where she said she had found the children. The next search warrant, executed "approximately two weeks later," was to search for the manufacture of methamphetamine. Regarding the temperature experiment, Investigator Scoggins said that the temperature on June 28, 2012, was 101 degrees, and on July 3, when they conducted the experiment, it was less than that. The car was parked in the same location as on June 28, and the purpose of the experiment was to measure the outside temperature and that at different locations in the car, using seven or eight thermometers. Every thirty minutes, each thermometer was read for the temperature shown and was photographed. The conditions on the day of the test were the same as on June 28, except for the lower outside temperature. At 1:00 p.m. on the day of the test, the ambient air temperature inside the car was 129 degrees.

Investigator Scoggins testified that the defendant told him she had a date with Mike Mauradian the night of June 27 and was with him from 4:30 or 5:30 p.m. until about 10:00 p.m., when she left to go home. However, after officers asked to search her cell phone, she recalled that later she had gone to the residence of Preston Woods. Describing the layout of the interior of the defendant's vehicle, he said that the back passenger door "was obstructed based on the front seat being leaned back very far and two car seats piled up right behind it, you couldn't get between the seat and the car seats. It would have been hard to get through there." He said that, of the four doors of the vehicle, "the only door that opened from the inside was the right rear which was blocked by the two car seats."

Melanie Carlisle testified that she was employed by the Tennessee Bureau of Investigation ("TBI") as a special agent forensic scientist in the field of toxicology and blood alcohol. She said that her testing of the defendant's blood showed "amphetamine at less than .05 micrograms per milliliter, and methamphetamine at less than .05 micrograms per milliliter." She said that, following a methamphetamine "high," a user would reach a "crash stage" and become depressed and sleepy.

Monica Datz testified that she was a crime scene investigator and latent print examiner with the Bradley County Sheriff's Office. She examined the defendant's vehicle and described the condition of the doors:

> The front driver door, the exterior handle was broken but the door can be opened from the exterior by putting my hand in the hole and searching for and pulling, and I actually had to have one of our garage employees show me how to do it. I couldn't get the door open myself but I was able to pull on a mechanism inside there and open the door. And the interior handle on the driver door is broken, but it can be opened by pulling forward on a little piece that was still there, and I had to pull forward to open that.

As for the front passenger door, she said that 'the exterior handle is missing, there's a hole in this area. I pulled on a bar in the hole and it locked and unlocked all the doors, but the door would not open for me." She added that the interior handle of the front passenger door was broken off as well, and she could not open this door from the inside. The exterior handle of the back driver door worked "properly," but the interior handle was missing and she could not open the door from the inside. She said that the defendant's cell phone was in the trunk of the vehicle.

Jan Null testified that he was a meteorologist in Saratoga, California, and since 2001, he had been studying when outside temperatures were between 72 and 96 degrees. He described the effect of the sun's heating the interior of a vehicle:

> A car basically acts as a greenhouse. The sun's energy comes in what is short wave energy, very high energy. It doesn't heat up the air very much but heats up objects inside a vehicle. It's not uncommon for seats and dashboards to be 200 degrees. That in turn gives off heat that warms the air inside of a car, the same sort of radiant heat you would have from that . . . little glowing heater you have under your desk for those cold window [sic] mornings. That's heating up the car. Well, a car is a closed area and so that heat continues to rise, and it actually heats up very rapidly. In the first 10 minutes a car heats up about 19 degrees above whatever the outside air temperature. After a half an hour it's 34 degrees above whatever the outside air temperature is, and in an hour it's 40 degrees plus above whatever the outside air temperature is.

Mr. Null added that, at about one hour, the interior temperature of a vehicle reached a plateau of about 45 degrees more than the outside temperature. He had reviewed temperature records, and the June 28 temperature at the Cleveland water treatment plant was 101 degrees. He explained how the interior temperature of a car would rise as the outside became warmer:

> It would have heated up to, let's say what that 85 degree temperature, during that first hour it would have gotten to 125 or so, and then gradually as the day warmed up, as the day warmed from that 85 to 101 the temperature inside the car, again that plateau would have been reached and it would have stayed up at that range.

Mr. Null said leaving the windows of a vehicle partly open made little difference of the interior vehicle: "It mattered very little as far as windows being cracked. I have looked at a number of days where they were cracked and it made a difference of about two or three degrees on the extreme end of the temperatures."

Dr. Steven Cogswell testified that he was the deputy chief medical examiner at the Regional Forensic Center in Knoxville. He described the effect on the human body as its temperature rises:

> Well, at a 109 degrees he will be comatose and probably die. Above a 108 we start seeing brain damage, irreversible brain damage. Above 104 we start seeing reversible kind of changes, the ones that I've already gone over. But when you get to about, roughly a 105 or 106 or so coma starts setting in because you are simply unable to maintain conscientiousness [sic]. Your brain is not getting enough blood. What blood it is getting doesn't have much oxygen, you are not moving it very well, and basically your body begins this process of shutting down. Ultimately that leads to death. At a 109 degree core temperature though you would be expected to be in [a] coma if not death [sic] by that point.

Sandra Gail Keith, the first witness for the defense, testified that she was the defendant's mother. She said that her father owned the residence where the defendant was living. Keith said she was employed as a truck driver and had lived in the residence herself from 2007 until May 2012. The defendant and her husband were living there during the same period. She said that the two victims liked to get into the defendant's car and "pretend like they were driving or they would just get toys and get out there and just play inside the car."

Tracy Lynn Honey testified that she was the defendant's aunt. She went to the hospital soon after the victims had arrived there and the defendant was "pretty frantic, screaming, crying." She accompanied the defendant back to her trailer to meet with Investigator Scoggins. Later, they both went to the sheriff's department.

Wanda Faye Ghorely testified that she was the defendant's grandmother. She said the victims liked to play in cars by themselves. She said that she sold the car to the defendant and that the two front doors could be opened from the inside with a hook, which the victims knew how to do, as well as to unhook their seatbelts. The rear doors opened and closed normally.

Thomas Michael Kile testified that he was the biological father of the defendant. He said that, the evening before the deaths of the victims, the defendant had come by his residence between 9:30 and 11:00 p.m., appearing "fine" and not under the influence of drugs or alcohol. He described how she had come to his residence the following morning, the day of the victims' deaths:

She come flying in my driveway, dust was boiling, she got out and hollered "Help me." She got one, if I can remember which one it was, but one of the children out of the back of the car and I said something about calling 911, and her phone did not work. I don't think she could do nothing but text on it[.]

He said that a call could not be placed with the defendant's phone, so he called 911 with his own. Paramedics arrived in ten to fifteen minutes. He was in "panic mode" at the time and could not recall if the defendant told him what had happened to the victims.

The defendant testified that, prior to the deaths of the victims, she had been doing part-time work for a cleaning company and grooming dogs at a Petco store. The father of the victims "[r]arely" saw them and did not pay child support. She said that, at the time of the victims' deaths, she was not using methamphetamine "very often at all" and had last done so two days before. The evening before the victims died, she had smoked marijuana. The morning of the 28th, she had fixed eggs for the children's breakfast. Then, she and the victims went outside where she set up the Slip and Slide for them to play on, which they did. Sometimes, they would get into her car when she was outside with them, but she did not like their doing so and would spank them. Most of the time when they did so, they would leave the car door open.

The defendant testified that the victims usually took naps between noon and 2:00 p.m, but "[m]ost of the time they wouldn't go to sleep." While the victims were outside, she had been checking on them through a window in the master bedroom. She said that she had been cleaning her residence and "basically realized that I didn't hear them and it had been a minute since I hadn't heard them and I went out to check on them." She went outside and heard the eldest victim. She then took both victims and put them in her car. She did not call 911 from her residence, because her cell phone would send only text messages.

She said that, in the garage, she had kept a marijuana pipe and a methamphetamine pipe. She denied knowledge of materials for making methamphetamine found in the dumpster, or providing a place to "cook" it.

Following this testimony, the defense rested its case.

## ANALYSIS

On appeal, the defendant argues that the evidence was insufficient to support the convictions and that the trial court erred in refusing to sever the counts regarding the deaths of the victims from those alleging the initiation of the manufacture of methamphetamine and

in imposing consecutive sentences.  We will consider these claims.

## I. Sufficiency of the Evidence

The defendant was indicted as follows:

Count 1:  June 28, 2012, first degree murder for the death of [L.B.], during the commission of aggravated child neglect, in violation of Tennessee Code Annotated section 39-13-202.

Count 2:  June 28, 2012, aggravated child neglect for the death of [L.B.], a child under the age of 8 years, in violation of Tennessee Code Annotated section 39-15-402.

Count 3:  June 28, 2012, first degree murder for the death of [R.B.], during the commission of aggravated child neglect, in violation of Tennessee Code Annotated section 39-13-202.

Count 4:  June 28, 2012, aggravated child neglect for the death of [R.B.], a child under the age of 8 years, in violation of Tennessee Code Annotated section 39-15-402.

Counts 5-8:  June 28, 2012, the defendant initiated a process to manufacture methamphetamine, in violation of Tennessee Code Annotated section 39-17-435.

Count 9:  June 28, 2012, purchase of ingredients used to produce or manufacture a Schedule II controlled substance, to wit: methamphetamine, in violation of Tennessee Code Annotated section 39-17-408.[1]

In assessing the defendant's claim regarding the sufficiency of the evidence, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State

---

[1]The defendant was found not guilty of this offense.

v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated child neglect, as alleged in Counts 3 and 4, occurs when a person "knowingly, other than by accidental means, . . . neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare," and serious bodily injury results. See Tenn. Code Ann. §§ 39-15-401(a), -402(a)(1). "Serious bodily injury" is defined as bodily injury involving: "(A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; or (E) [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Id. § 39-11-106(34). To sustain the conviction for first degree felony murder, the State had to prove beyond a reasonable doubt that the defendant killed the victims "in the perpetration of or attempt to perpetrate any . . . aggravated child neglect." Tenn. Code Ann. § 39-13-202(a)(2).

The defendant also was convicted of four counts of facilitation of the initiation of the process to manufacture methamphetamine. Tennessee Code Annotated section 39-17-435 provides in pertinent part that "[i]t is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." Tenn. Code Ann. § 39-17-435(a). The statute further provides that "'initiates' means to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active

modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." Id. § 39-17-435(c). A person facilitates a felony if, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Id. § 39-11-403(a).

We will review the testimony regarding these convictions.

Investigator Scoggins testified that the defendant changed her explanation several times as to what the victims had been doing while outside the morning of their deaths. Among other statements, she first said that they had been playing the yard but later said it was "possible" they had been under the front porch. When told of the results of the autopsies of the victims, she said the victims had been beside the motor vehicle but later admitted she had found the younger victim, R.B., in the right front passenger seat of the vehicle and L.B. "partially hanging out of the right rear passenger door." The defendant and other witnesses, as we have set out, testified that the victims liked to play in the car.

The State presented testimony that the defendant tested positive for methamphetamine when she was tested shortly after the bodies of the victims had been discovered. This drug makes the user sleepy. Additionally, the evidence showed that the victims liked to play in the defendant's car and that on the day of their deaths the temperature was over 100 degrees. The State presented testimony that, because of the broken interior door handles, it was difficult, if not impossible, to open the doors from the inside the car. Meteorologist Jan Null testified that the temperature inside the vehicle would have been about 45 degrees higher than the outside temperature, which was 101 degrees on the day of the victims' deaths. Upon being questioned about the deaths, the defendant gave conflicting statements as to how long the victims had been unsupervised and where she had discovered their bodies. Instead of immediately going to a neighbor's to seek help, the defendant, instead, drove the victims to her father's house, delaying the arrival of emergency medical personnel. Medical experts testified that the core temperature of the victims could not have been so high unless they had been in the defendant's car.

From all of this proof, a reasonable jury could have concluded that the defendant was sleeping, as a result of her use of methamphetamine, while the victims were in the yard, unsupervised, for an unknown period of time. The defendant knew that the victims liked to play in the car, that the day was hot, and that the car doors could not be opened by the children from the inside of the vehicle. Further, a reasonable jury could have concluded that, to mask her responsibility, the defendant gave conflicting versions as to what had occurred and how she had found the victims. Thus, the evidence is sufficient to sustain the

-10-

defendant's convictions for felony murder and aggravated child neglect.

As for the facilitation of the initiation of a process to manufacture methamphetamine convictions, Investigator Scoggins testified that he found four plastic bottles on the property where the defendant resided, which had been used in the "shaker" method of methamphetamine manufacture. In one of the bags where a bottle was found, officers also discovered the defendant's checkbook and, in another bag containing a bottle, was a warrant addressed to the defendant. Also recovered from the bags were a lithium battery, Coleman fuel, and a pill wash, all of which are used in the manufacture of methamphetamine. From this evidence, a reasonable jury could have concluded that the defendant had engaged in the facilitation of the initiation of a process to manufacture methamphetamine.

## II. Severance

The defendant contends that the trial court erred by not severing the counts of the indictment alleging the drug offenses from those charging felony murder and the aggravated child neglect offenses.

Tennessee Rule of Criminal Procedure 14(b)(1) provides that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others."

Before a trial court may deny a severance request, it must hold a hearing on the motion and conclude from the evidence and argument presented at the hearing that (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of one of the offenses is relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of the other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

There are three categories of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to be considered "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. State v. Shirley, 6 S.W.3d 243, 248 (Tenn. 1999) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.11, at 180 (3d ed. 1995)).

"Decisions concerning consolidation and severance of offenses pursuant to [Tennessee] Rules of Criminal Procedure 8(b), 13 and 14(b)(1) will be reviewed for an abuse of discretion." State v. Denton, 149 S.W.3d 1, 12 (Tenn. 2004) (citations omitted). "An abuse of discretion in this context implies that the trial court applied an incorrect legal

standard or reached a decision against logic or reasoning which caused an injustice to the complaining party." Id.

Following a hearing on the defendant's motion to sever, the trial court explained why joinder of the counts was proper:

> The Court makes the following findings of fact: the crime scene where the Aggravated Child Neglect and Felony Murder occurred was a secluded property on a hill 50 to 75 yards off the roadway with trees that conceal it. The dumpster on the property was full and overflowing with garbage. The Court finds the Defendant was the person staying/living on the property with the victims and with access to the garage, dumpster and trailer. The Court finds the Defendant's mother was a truck driver and was gone for long periods of time. The Defendant's mother was the only other person, that proof was clearly offered, had access to the dumpster, trailer or garage. The Defendant tested positive for having methamphetamine in her system on the same day law enforcement responded to the crime scene. The shake bottle methamphetamine labs and pseudoephedrine pill packets were found at the crime scene soon after the crime occurred and property of the defendant was found in close proximity to the shake bottles. A photo of the victims was found in a bag with one of the meth labs.
>
> The Defendant seeks a severance under [R]ule 14 b 1.
>
> The Court finds that the offenses were properly joined by the Grand Jury as the offenses are all part of the same criminal transaction or episode and that proof of each criminal charge would be proof on the other criminal charges during a trial. The Court finds the offenses charged all occurred within a relative close proximity of time and location. The Court finds clear and convincing proof of the [i]nitiation and [p]romotion of methamphetamine manufacture was being committed by the defendant at the time of the Aggravated Child Neglect charge. The Court finds the probative value outweighs the danger of unfair prejudice. The Court finds the methamphetamine manufacture is relevant to credibility and motive. The Motion to Sever is DENIED.

In resisting the defendant's motion for severance, the State made several arguments. The State noted that the defendant tested "positive for methamphetamine on the day the children died" and asserted that the continuing plan of the defendant was "the production and use of methamphetamine . . . and that plan continued up until these two children tragically

-12-

died . . . as a result of neglect." Further, the State argued that the drug charges were "corroborative of the state's proof regarding [the defendant's] drug use." Defense counsel responded, in part, that the State was unable to prove "these bottles and these blister packs that were found in the dumpster were in any way involved or resulted in [the defendant's] conduct resulting in aggravated abuse or neglect."

As we have set out, the State's proof was abundant that the defendant knew the victims were outside unattended on a very hot day and that they liked to play in the car, the doors of which could not be opened from the inside by children. At the time this was occurring, the defendant had methamphetamine in her system, a drug which would make her sleepy. She gave police officers conflicting and changing accounts as to how she found the victims and the emergency actions she took after doing so. However, the State presented no proof that the defendant was inattentive because, as the victims were trapped and dying, she was facilitating to initiate a process to manufacture methamphetamine or purchasing ingredients to do so. In fact, the defendant did not contest the fact that she had methamphetamine in her system the day that the victims died.

In support of its argument that the trial court was correct in allowing the drug offenses to be tried with the felony murder and aggravated child neglect offenses, the State relies on State v. Danita Lanette Wilson and Tiffany Nicole Norman, No. M2008-02850-CCA-R3-CD, 2011 WL 6382550 (Tenn. Crim. App. Dec. 19, 2011), perm. app. denied (Tenn. Apr. 11, 2012), in which the defendants were tried on various child neglect and endangerment charges involving young children as well as others charging drug offenses. The State's proof in that case showed that drug screens of the victims revealed, in varying combinations, ecstasy, methamphetamines, and cocaine. Concluding that the trial court had ruled correctly that the drug and neglect charges could be tried together, this court explained that "[t]he child neglect charges directly relate to the ongoing drug activity at the [defendants'] residence and show that the [d]efendants acted knowingly in exposing the children in the residence to drugs." Id. at *18.

However, in the present appeal, we disagree with the State's arguments that joinder was proper of the offenses regarding the deaths of the victims and those regarding drugs. The State presented no proof that the defendant's inattentiveness to the safety and welfare of the victims and the manufacture of drugs were, together, parts of a continuing scheme or plan. In fact, the execution of the search warrant, during which officers located the methamphetamine evidence, was executed approximately two weeks after the deaths of the victims. Further, the State's witnesses were unable to say exactly when, in relation to the deaths of the victims, the drug facilitation had occurred. Given the explosive nature of the two sets of charges, deaths of young children and manufacture of illegal drugs, we conclude that the joinder constituted reversible error. Accordingly, we reverse the convictions for the

drug offenses, Counts 5 through 8 of the indictment, and remand these for a new trial. The reversal of these counts does not affect the convictions for Counts 1 through 4, which we affirm.

### III. Sentencing

The defendant argues that the trial court erred in ordering that the sentences for the two felony murder convictions be served consecutively. We will review this claim.

Reviewing the grounds for consecutive sentencing, the trial court found that such sentencing was proper because the defendant was a dangerous offender:

> Everybody in this case has testified and the letter from the paternal grandmother all seems to lead to a conclusion that [the defendant] never had an example of how to be a mother, and that was testimony from more than one person in this case. There seems to be some criticism about that but I'm not sure other people are responsible for what she did. When I get to the factor under discretionary consecutive sentencing I do find that the defendant is a dangerous offender whose behavior indicates little or no[] regard for human life and no hesitation about committing a crime in which the risk to human life is high. Her children were introduced into a horrible place and around horrible goings on, and the jury found that she was a facilitator and so around horrible activity. So I do find that the proof in this case was that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, the human life of her two boys, and no hesitation about committing a crime in which the risk to human life is high, and all three of the following factors apply: the circumstances surrounding the commission of the offense are aggravated, the confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an anti-societal lifestyle. There's no doubt she was living an anti-societal lifestyle in the drug activity, in this meth activity. She was leading an anti-societal [lifestyle] and she took her children into that lifestyle with her. Most importantly I find that the aggregate length of the sentence is reasonably relate[d] to the offense of which the defendant stands convicted, and that is two murders. She is convicted of two murders, she's not convicted of one murder. She's convicted of two murders. So I find that that discretionary factor does apply and that it relates to this defendant and I do sentence her to consecutive life sentences, all other offenses to run concurrently or at the same time.

The trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) apply, including that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Id. § 40-35-115(b)(4). When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence was necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). As to consecutive sentencing, our standard of review is abuse of discretion with a presumption of reasonableness. State v. Pollard, 432 S.W.3d 851, 861-62 (Tenn. 2013).

In State v. Dorantes, 331 S.W.3d 370, 374-76 (Tenn. 2011), our supreme court detailed the horrific injuries to the victim, whose cause of death was battered child syndrome. When his body was found in a public park in Nashville, the victim had "multiple injuries to virtually every surface of [his] body," including "serious burns to entire areas of his feet . . . [and] extreme burns to the entire area of the buttocks, rear upper thighs, and genitals." Id. at 375. The State's medical expert testified that the victim's injuries were consistent with his "having been intentionally forced into a liquid over 150 degrees for at least one second," causing burns so serious that it would have been painful to sit or walk, and the resulting infection damaging the victim's internal organs so seriously that they were "failing at the time of his death." Id. Additionally, the victim had puncture wounds throughout his body, as well as blunt trauma injuries to the brain, skull, and hand. These injuries supported the finding that the defendant had committed the offenses of aggravated child abuse and felony murder by aggravated child abuse.

Because the defendant in the present appeal, at a minimum, demonstrated extreme callousness toward the health and welfare of the victims, and the results were fatal, the trial court, in our view, had a reasonable basis for imposing consecutive sentences.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments for Counts 1-4 and reverse and remand those for Counts 5-8.

_____
ALAN E. GLENN, JUDGE